THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JACK CANNON SIMPSON, Defendant-Appellant.

Fourth District   No. 12379

Opinion filed June 3, 1976.—Rehearing denied July 30, 1976.

GREEN, J., dissenting.

Richard J. Wilson and Daniel D. Yuhas, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield, (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

On January 25, 1973, the grand jury returned a seven-count indictment charging the defendant-appellant Jack Cannon Simpson, Jr. (in the first five counts) with the murder of Gwen Ellen Woods on October 30, 1972. The sixth and seventh counts charged defendant with voluntary manslaughter in connection with her death. On April 2, 1973, the jury convicted defendant of murder. The two counts of the indictment charging voluntary manslaughter were dismissed, on motion of the State, over defendant's objection at the close of all the evidence. Defendant was sentenced to a term of 25 to 75 years.

Since the issues raised deal, in large measure, with the admissibility of certain evidence a recital of pertinent facts is set forth.

On October 31, 1972, the body of Gwen Ellen Woods was discovered under a bridge in a rural area in Sangamon County. In the opinion of Dr. Grant C. Johnson, who performed the autopsy, death was due to a gun shot wound in the head. The point of entry of the bullet was very slightly to the right of the center of the upper lip, it had entered the head perpendicularly to the lip and pursued a straight course backward. Dr. Johnson also testified "* * * that the muzzle of the gun was not a contact wound, nor was it within a short distance from the skin * * * that is a matter of six, seven inches. Beyond that I can make no statement." He also observed several other wounds or scratches or bruises on the body, the larger portion of which were inflicted, or occurred, after death. The bullet which was recovered from the decedent's skull was examined by employees of the Illinois Bureau of Identification. They described the bullet as a .38-calibre pistol bullet. The examiner could not recall whether the bullet's lands and grooves indicated that it could have been fired by a Titan Tiger .38, and that the projectile could also have come from many other models of .38-calibre weapons. There was testimony that defendant

had purchased a .38 Special Tiger on April 21, 1972, from Fishman Sporting Goods.

All of the witnesses who testified were called by the State. Martha Fry, manager of the Harness House, a restaurant-bar in Springfield, observed defendant and the decedent in her place of business on the evening of October 29 (all dates are referenced to 1972). They arrived about midnight, had one drink and left. She observed no argument between them, observed no cuts or bruises on defendant's face, and saw no fight or scuffle inside the restaurant.

Oren Dalby, a deputy sheriff, while on routine patrol during the evening of October 29 observed a late model Corvette, license number JL1787 on a street in the outskirts of Springfield. Standing by the car was defendant and a young woman engaged in a loud argument. Dalby stopped, got out, and defendant rushed up to him and said some belligerent words. Dalby told defendant to get back in the car and take the young lady home. He saw no facial cuts on defendant's face. Defendant and his companion left and Dalby followed them for a few miles feeling that another altercation might start, and wanted to give the couple time to "cool off." He did not believe that the argument he had observed was so heated that he was concerned about the woman's safety.

A driver for a Springfield Dairy, at 3:30 a.m., on October 30, observed a late model Corvette parked near a bridge on Route 6E. At about 5 a.m., on the same day, Keith Fry, a local farmer observed a late model Corvette parked near the bridge. He stopped and looked at the car, and noted that the gearshift was in the "drive" position. The license number of the car was JL1787. He saw no one in the vicinity. That evening, seeing that the car had not been moved, Fry called the State Police. Galan Johnson, a State Trooper, proceeded to the scene, made a cursory examination which revealed nothing out of the ordinary. Johnson then called George Day, operator of a local towing service and had the car towed away.

Jay Dodd, brother of the decedent, testified that immediately prior to her death she had been living with defendant. On October 30, defendant called Dodd and inquired if he had seen his sister. Dodd had not, and defendant then told him that the decedent had dropped him off at his car in Pawnee, Illinois, and that was the last he had seen of her. Dodd also stated that Gwen owned a 1972 Corvette. On the morning of October 31, defendant again called Dodd and stated that he had been unable to find Gwen and asked Dodd to assist him in locating her. Dodd continued his testimony as follows:

> "We left my house in our own cars. * * *he parked his * * * in Pawnee and he got in my car with me and we went out to where the car had been off in the ditch * * * then we went back up town and had a cup of coffee * * * and after we had the cup of coffee,

Jack called the State Police and asked them about the car and they said that George Day had towed the car in * * *. We went to George's, * * *I paid the towing bill on the wrecker towin' * * * and he was gonna take it to * * * Lowder to her trailer, * * * and I backed the car out of George Day's garage and got out of it and was gonna' get back in my own car and Jack got in the car and found the blood on the door and the seat of the car and he called me back over to the car and then we went back in and I asked George, I said, 'George, what do I do?' and he said to call Trooper Johnson, so I called him up on the telephone and he said to stay there and he'd be down there in about five minutes.

So we waited there for him and he came down and looked at the car and so he decided we should go back out to where the car was off in the ditch. We went back out there and the Trooper went in his pick-up truck. He was off-duty and Jack and I went in my car out there where the car went off * * * and I went down on the west side of the road toward the water there in that stream and looked under the bridge and found her."

When Dodd backed Gwen's car out of the garage he did not see her purse, although he looked for it. He also noted, on the morning of October 31, that defendant had a cut "* * * clear across the bridge of his nose".

The Sangamon County coroner summarized the testimony given by defendant during the inquest into the death of Gwen Woods as follows:

"* * * he stated he was in the company of Gwen Ellen Woods in the afternoon and evening hours of October 29. I asked him if * * * they had done some socializing * * * I asked * * * if it was local establishments and he said, 'Yes, the last of which was the Harness House' * * *."

He stated Gwen Ellen Woods had encountered a male subject known to him only by the first name 'Tom' and appeared to be having some type of verbal altercation with him in another part of the establishment.

* * *He stated he went and joined Gwen Ellen and the gentleman, * * * and that an argument had ensued between himself and the male gentleman and there was a slight altercation outside the establishment, between he and the male subject * * * I asked him if there was any body injuries in the incident and he said he had a cut on his nose, he didn't know where from.

He stated that they had got into Gwen Ellen's car, which was identified as a '72 Sting Ray * * * Corvette, * * *and left the area * * *stated they were stopped by a law enforcement officer.

* * * I asked him why they were stopped. He said they were

arguing * * *. He was somewhat vague about the circumstance. He did not know the person or the particular law enforcement agency * * * I asked him if he recalled who the driver of the car was when he went there and he said he thought she was.

I asked him if he thought she was in a condition to drive an automobile * * * and I don't exactly recall his question, but I believe it was later answered that * * * she refused to let him drive. The argument between he and she was over the fact that he wanted to know the circumstances of the altercation * * * in the Harness House and she stated that it was something that happened a long time ago and nothing to concern him.

He stated that he thought he had seen the gentleman a number of times in a tavern in Kincaid cooperated by Gwen Ellen Woods at one time.

I next asked him if he could tell us the direction or pattern of travel to arrive at Pawnee where he stated they were going to pick up his car at his parents' home. He stated he thought they went west to get to Pawnee.

* * * Next was that they were in Pawnee * * *.

He said he got in his car and she continued on east-bound again. He got his car, came back northbound, turned left turn to become west-bound on 104, which would be proper or reasonable way to go to Lowder in this area where the trailer was, where, apparently, they were cohabiting. He stated that he did not see Gwen Ellen Woods after that time."

The next witness called was Mrs. Anne Simpson, wife of the defendant who testified that they were no longer living together. Prior to trial defendant had filed a motion in limine to bar privileged communication testimony of this witness who had been listed as a witness for the State. It was urged that the State intended to question her about such a communication which had occurred at her trailer a short time after the offense took place. The defendant argued that the communication was barred from admission into evidence by the provisions of section 155—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 155—1). He argued that the statute barred the use, not only of any conversations between defendant and his wife, but "* * * also circumstance surrounding that conversation." The State's Attorney responded that the statute did not bar Anne Simpson's testimony as to physical description and physical acts. He also argued that divorce proceedings had been commenced to sever the marriage, and that there was no justification for maintaining the confidentiality of the marital relationship communications. The court's ruling on the motion was that any conversations between defendant and his wife would not be

admissible if the privilege was claimed, but that she would be permitted to testify as to anything that she observed, and what she did, and what her husband did at the trailer.

When Mrs. Simpson was called as a witness defendant renewed the motion. The court's ruling was the same. The witness then testified that: About 5 a.m., on October 30, defendant came to her trailer. He pulled himself into the trailer (there was no step) with his left hand, and had some articles clutched to his body with his right hand. He had mud and briers on his boots and pants—very, very thick. His hair was messed up; he had a deep gash on the bridge of his nose, the gash was bloody; it looked fresh. He was very messed up, his eyes were very bloodshot. There were bloodstains around the elbow areas of his shirt, and his hands had abrasions on them around the knuckles. He seemed very upset and disturbed. Defendant laid the articles which he had been carrying on a bed, removed his boots. She cleaned the boots. He put on clean pants, identical to the ones he had been wearing. He tended to the gash on his nose and the scrapes on his hands. Mrs. Simpson took a cloth and aided defendant in using cold water to get the blood spots off of his shirt which was mainly centered around the elbows with a few drops on the front. Defendant then emptied a woman's purse onto the bed. She recognized the purse as belonging to the decedent; it contained a necklace which she recognized as that of the decedent. She offered to wash defendant's clothing. He took it away from her, and gave her the keys to his car. She went to the car and got a can of gasoline from the trunk. She picked up the pants which defendant had been wearing, saturated them with gasoline and put them in the incinerator, set fire to them and added garbage to the fire. She stoked the fire to keep it burning. Defendant came to the incinerator with a bundle wrapped in "* * *that blue sweater-vest he had on * * *." The bundle was the size of a pillow. She did not know what was in the bundle. Defendant threw it into the fire, and kept stoking the fire. Articles would fall out, and he put them back in. The witness testified that defendant had spent most of his life in the Pawnee area, and had hunted and fished in the area where the body had been found.

A neighbor of Anne Simpson observed the incinerator burning and saw defendant and her at the scene.

Prior to trial defendant had filed another motion in limine to bar testimony regarding a confrontation between defendant and his wife which occurred in the Sangamon County jail while defendant was being interrogated. On this occasion Mrs. Simpson related to those present an incriminating statement made to her by defendant when he entered her trailer at the time referred to in her previous testimony, to which statement defendant had responded, "I said that but I told you I was

lying." Defendant's counsel contended this was not an admission since he denied his guilt and its admission would indirectly violate the doctrine of privileged marital communication. The court denied the motion, stating "* * *it does not go to admissibility, but it goes to the credibility and it will be admissible * * *."

The last witness was Walter Kasten. Defense counsel renewed the motion above referred to and was overruled. He then moved that the testimony should be received for the limited purpose of showing why and how defendant replied to her statement in the jail, and not as an admission of fact or as testimony by her through Kasten, and that the jury be so admonished. The trial judge stated that the matter would be taken care of by "instructions if necessary".

Kasten testified that on November 30, 1973, he was an assistant State's Attorney in Sangamon County. Kasten, and two deputy sheriffs, Barry Brown and James Price, had been interrogating the defendant in the county jail. His testimony continued as follows:

> "* * *[W]e had been questioning the defendant, and Mrs. Simpson came into the room and sat down in a chair. I was sitting on the desk and the others were sitting on chairs, and either Mr. Price or Mr. Brown, I don't remember which one, said 'Now, Ann, tell us what he told you', and she said that he came to the trailer in the morning in question and said that he had shot Gwen and the defendant then spoke up and said, 'Yes, but I told you later I was lying.'
>
> We had been questioning the defendant from about * * * six-thirty * * * and he had been reasonably calm—fairly so, during the questioning, until Ann Simpson came in the room. He didn't know that she was up there and Ann Simpson came in the room and I was watching him to see his reaction, and he became very nervous and upset and began to squirm and that sort of thing. Very visibly so."

Defendant contends that it was error to permit his wife, Mrs. Anne Simpson, to testify concerning defendant's conduct and actions which she observed at her trailer during the early morning hours of October 30. His theory being that conduct, as well as conversation, can, and in this case did, constitute a privileged marital communication.

Section 155—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 155—1) provides in pertinent part that:

> "In all criminal cases, husband and wife may testify for or against each other: provided, that neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during coverture, except in cases where either is charged with an offense against the person

or property of the other, or in case of wife abandonment, or where the interests of their child or children are directly involved, or as to matters in which either has acted as agent of the other."

Defendant cites *People v. Burton*, 6 Ill. App. 3d 879, 286 N.E.2d 792, and *People v. Palumbo*, 5 Ill. 2d 409, 125 N.E.2d 518. However, both of those cases turn on the point that the testimony in question involved matters not intended to be confidential. Defendant also cites *People v. Daghita* (1949), 299 N.Y. 194, 86 N.E.2d 172, in which the reviewing court held that the testimony of defendant's wife, gained by her observance of his bringing home stolen merchandise and storing it in various parts of the house constituted a privileged confidential communication and thus barred from disclosure since "It cannot be supposed that the defendant would have so conducted himself except in reliance upon the free and unrestrained privacy of the marital relation and the socially desirable confidence which exists between husband and wife. * * *defendant made no effort to conceal or disguise his conduct at home from his wife. He was, in a word, confiding in her the information disclosed by his conduct."

The People cite *State v. Slater* (1950), 36 Wash. 2d 357, 218 P.2d 329, and state that the holding in *Slater* is: "* * * that the admission of a police officer's testimony of a conversation overheard by him in an adjoining hotel room, between the defendant and his wife, was proper." However, an examination of the opinion (*State v. Slater*, 36 Wash. 2d 357, 363, 218 P.2d 329, 332), establishes that the conversation occurred between the parties *prior* to their marriage, "* * * hence it was not a communication made during marriage." The court remarked that the statute precluded testimony by a husband or wife concerning conversations which occurred *prior* to marriage, but that a *third person* could testify to such conversations which he had overheard "whether by accident or design," and that the conversation, having been overheard was not, therefor, a privileged communication.

Whether or not conduct is to be construed to constitute "communication" within the meaning of the statute is the issue presented. While the court in *People v. Burton*, 6 Ill. App. 3d 879, 887, 286 N.E.2d 792, remarked that "An act as well as a statement can constitute a communication * * *" it did not delineate what *kind* of acts or conduct would be so considered. It would unduly lengthen this opinion to cite and discuss the great number of cases in which other jurisdictions have dealt with this issue. *Daghita* represents one end of the spectrum. There, the court seems more concerned with the defendant's expectation of confidentiality than with the question of whether "communication" was involved. Other cases go even further and hold that *any* information acquired by reason of the marriage relationship is privileged. For

example, in *Prudential Ins. Co. of America v. Pierce's Adm'x.* (1937), 270 Ky. 216, 109 S.W.2d 616, the issue was the age of the decedent. His surviving widow testified that the decedent had possessed a family Bible, and that she had seen the date of his birth entered there as having occurred on a certain date. On appeal the court held "Mrs. Pierce was not competent to testify concerning any communication between herself and her husband. Section 606, Civil Code. 'Communication,' as there used, embraces all knowledge obtained by reason of the marriage relation * * *. All the knowledge she had of this matter had come by her husband having the Bible in their home." 270 Ky. 216, 219, 109 S.W.2d 616, 617.

In enacting statutes similar to the Illinois statute above cited, most states have confined the privilege to "communications" except for a very small minority which included the words "communication * * * or an act done by either * * *" or the provision that neither husband nor wife could testify "to any matter that occurred between them * * *" during the marriage. McCormick on Evidence 163 (2d ed. 1972).

Some jurisdictions have construed the meaning of "communication" in a manner which sharply contrasts with the rules laid down in the line of authority exemplified by *Daghita* and *Pierce's Adm'x.* These cases appear to limit the privilege by construing the statutory language "communication" to mean what it is ordinarily considered to mean, and, in the process, refusing to include in the definition conduct *not* communicative in nature. (See cases cited in McCormick on Evidence 164, N. 19 (2d ed. 1972).) At page 163 of the same volume the author states "* * * it would seem that the privilege should be limited to *expressions* intended by one spouse to convey a meaning or message to the other. These expressions may be by words, oral, written or in sign language, or by expressive acts * * *" such as opening a trunk and pointing out an object. We agree with this reasoning.

The policy considerations underlying, and said to justify and support, the privilege have been stated to be the danger of alarm and unhappiness occasioned to society by compelling disclosure of confidential communications between husband and wife; that it is founded on a social policy of protecting the marital relationship, or that each party to the marriage should be entitled to rely upon the free and unrestrained privacy of the marital relationship. In essence, it may be said that the courts have tended to discourage anything which tends to disrupt a marriage because of the importance attached to that institution. It would seem, however, in view of the fact, that extending the privilege to noncommunicative acts often, as here, precludes the judicial process from a consideration of plainly relevant facts which prove, or tend to prove, the commission of a crime. A policy of social import is also involved in that proposition. A loyal spouse should not, in our view, become a partner in crime with

the blessing of the law bestowed through a strained construction of the statute which is said to be supported by a policy of promoting marital bliss.

■■ ■ We therefore hold that the description by one spouse of conduct of the other spouse does not constitute "communication" within the statutory proscription, unless that conduct is an expression clearly intended as a substitute, or to be in lieu of, the spoken word. There was no error in the admission of Anne Simpson's description of her actions and those of her husband at her trailer on the morning of October 30, 1972.

■■ Defendant also argues that the court erred in permitting assistant State's Attorney Kasten to testify as to the above quoted conversation between defendant and his wife, repeated by her in Kasten's presence. The State responds by arguing that this was simply proof of an admission made by defendant which was admissible as an exception to the hearsay rule. The defendant does, indeed, argue that the testimony was hearsay. More importantly, however, he argues that the conversation repeated by Anne Simpson to Kasten was a confidential communication within the purview of the statute. We agree. Both *Wigmore* and *McCormick* agree that the communicating spouse is the holder of the privilege in question. (McCormick on Evidence 169 (2d ed. 1972).) This view is supported by *Fraser v. United States*, 145 F.2d 139 (6th Cir. 1944) *cert. denied*, 324 U.S. 849. "That the privilege is available only to the marriage partner and not to third parties is without doubt. * * *The privilege is usually granted solely to the communicator of the confidential communication * * *." (46 Chi.-Kent L. Rev. 71, 73 (1969).) The privilege is not destroyed if the contents of the communication be learned by others as a result of the betrayal or connivance of the spouse to whom the communication was made. (See McCormick on Evidence 167, 168 (2d ed. 1972) and cases there cited.) This proposition needs no extended support here. To permit Anne Simpson's testimony as to the contents of conversation which is clearly a confidential communication within the meaning of the statute, effectively destroys the privilege, nor can she waive a privilege which the defendant holds. By this means Kasten was permitted to testify to matters while Anne Simpson was precluded from doing so. The statute cannot be so avoided. The admission of Kasten's testimony was highly prejudicial and it was reversible error.

Defendant further argues that the trial court erred in refusing to give his tendered instructions on voluntary and involuntary manslaughter. We do not address those issues. Whether or not either or both are to be given depends upon the evidentiary posture of the case. Since the case must be retried there is no means of determining what the evidence will be; there may be more, there may be less, and the propriety of giving or refusing either or both of the instructions will depend upon that circumstance. The

issue as to excessiveness of sentence is not viable since defendant is to be retried.

Reversed and remanded for new trial.

TRAPP, P. J., concurs.

Mr. JUSTICE GREEN, dissenting:

I agree with the majority that the admission of Anne Simpson's testimony describing her actions and those of her husband, the defendant, at her trailer on the morning in question was not error. I disagree with their ruling that the admission of the testimony of Walter Kasten concerning the conversation between Mrs. Simpson and defendant at the county jail was error. Kasten testified that Mrs. Simpson said that defendant had told her at the trailer that he shot the victim. Kasten further testified that defendant then responded "Yes, but I told you later I was lying."

I agree that the purpose of the marital communication privilege is to allow each of the parties to rely on the free and unrestrained privacy of the marital relationship. Since the privilege does not protect constitutional rights and tends to impede the truth-seeking function of a judicial proceeding, I would not give it broad scope. The privilege gives the communicating spouse, here the defendant, no assurance that the other spouse, here the wife, will not reveal the communication to others. He is protected from her testimony that he made the statement. I would concede that, as here, the communicating spouse is also protected by the privilege and the hearsay rule from others testifying as to a disclosure of the communication that the other spouse may have made to them. Thus, had there been no evidence that the defendant admitted making the statement where he in turn admitted shooting the victim, the admission of Kasten's testimony would have been error.

Here, however, defendant publicly admitted making the statement for which privilege is sought. Neither text nor case authority dealing directly with the application of the privilege to this set of facts has been called to my attention. I see no social purpose, however, in granting privilege to a communication that the communicating spouse later publicly admits making. It would seem illogical to grant privilege to a communication so disclosed and to deny it to an oral communication overheard by an eavesdropper or a letter intercepted or misdelivered (see McCormick On Evidence 167 (2d ed. 1972).) I find no error in the admission of Walter Kasten's testimony.

In view of the disposition made of the case and the fact that the majority does not comment upon the propriety of the ruling on the tendered manslaughter instructions, I also choose not to comment on this issue.