**STATE of Minnesota, Respondent,**

v.

**Dennis John HANNUKSELA, Appellant.**

**No. C4–89–1065.**

Supreme Court of Minnesota.

March 16, 1990.

Lawrence W. Pry, Asst. State Public Defender, St. Paul, for appellant.

Alan Mitchell, St. Louis County Atty., Duluth, for respondent.

KELLEY, Justice.

Appellant Dennis Hannuksela on appeal from his conviction for the first degree murder of Arthur Nelson seeks a new trial for alleged trial court error in: (1) failing to suppress evidence seized by police pursuant to an alleged invalid general warrant, (2) violating his statutory marital communication privilege by permitting his ex-wife to testify about appellant's acts and gestures observed by her during the marriage, and (3) in admitting evidence of two prior aggravated forgeries committed by him. We affirm the conviction.

Arthur Nelson, a retired widower who worked as a seasonal maintenance employ-ee at the Washington County Point Douglas Park, disappeared after last being seen while leaving appellant's home in Prescott, Wisconsin, on September 5, 1987. Nelson's decomposed remains were not discovered until November 1, 1987, along a railroad track right of way a short distance outside the City of Gilbert in St. Louis County, Minnesota.

Arthur Nelson owned a brown 1978 Dodge enclosed pickup truck in which he kept boxes filled with many of his personal possessions. During the latter part of August and the first part of September 1987, appellant performed mechanical work on the truck at Nelson's behest. On September 4, 1987, one of appellant's neighbors saw appellant and Nelson together. In conversation at the time, appellant told the neighbor that he and Nelson were going up north together the next day. On that same date Nelson also told the woman with whom he lived that he was going up north the next day to have the truck painted.

On September 5, 1987, appellant was married to and living with Mary Granthum. In the early morning hours of that day, Mary Granthum observed appellant take a sawed-off shotgun, which had silver duct tape wrapped around the butt, from a storage area; put it and some shotgun shells into a pillow case; stuff the pillow case into the sleeve of his leather jacket; pin the sleeve and carry the jacket and place it in Nelson's truck which was parked on the street in front of the Hannuksela residence. Shortly thereafter she observed the two men depart from the parking lot at which time appellant was driving the truck.

David Homola, who lived with appellant's sister in the Gilbert, Minnesota area, observed appellant around noon of that day in the Gilbert area driving a brown pickup truck. Also, sometime before noon, appellant came to the home of his younger brother Thomas, in McKinley, Minnesota, and was at that time driving a brown Dodge pickup truck. (McKinley is approximately three miles from Gilbert.)[1]

---

1. Thomas also testified that on September 15, 1987, appellant phoned him and asked that he, Thomas, tell the police he hadn't seen appellant in the Gilbert area during the previous two months.

Later that day, at about 4:30 p.m., Mary Granthum again saw appellant, but this time at the K–Mart store in Cottage Grove, Minnesota, where she was employed. At the time appellant was still driving Nelson's truck. The following day she helped appellant unload items belonging to Nelson from the truck.

The neighbor who had seen appellant on September 4, also saw him late in the afternoon of September 5, at which time appellant told him Nelson had given him the truck as payment for the work appellant had done on it and that Nelson himself was purchasing a motor home. During the course of that conversation, appellant also revealed that he had a lot of money which he claimed he had received from his father.

On September 7, 1987, appellant went to Point Douglas Beach, where Nelson had worked, and told employees there he needed to get Nelson's paycheck because Nelson needed it to bail himself out of jail. He did not get the paycheck. However, the following day, appellant purchased a motorcycle and paid for it with a $250 check purportedly signed by Arthur Nelson.

Robert Nelson, Arthur Nelson's brother, on September 10, 1987, was told that his brother's automated bank teller machine access card had been used to make withdrawals since September 6. At trial, testimony of others connected appellant with using a "cash card." Mary Granthum, for example, saw appellant with a "cash card" in his possession which had Arthur Nelson's name on it, and, also observed appellant display an unusual amount of cash.

On the evening of September 11, Granthum accompanied appellant to Point Douglas Park where appellant took keys from the pickup truck and used them to enter into a park building. Upon leaving the building, appellant left the key remaining in the door. Three days later the key was found stuck in the door by park personnel who additionally found two sets of Nelson's keys inside the building.

Over the next few days, Wisconsin and Minnesota police officers concentrated their investigation on appellant's relationship with Nelson; they focussed on appellant's possession of Nelson's pickup, an insurance check endorsement which looked as if it was not Nelson's signature, and a signature on the title card to the truck that appeared to be suspicious. On one occasion after the appellant consented to an inspection of the pickup, he suddenly terminated the inspection, ostensibly to finish his work shift at McDonald's, but then departed leaving the officers standing in the McDonald's parking lot near the abandoned vehicle. Later, on that same day, appellant led the officers on a high speed chase before finally stopping and agreeing to return with them while they continued questioning him concerning documents purportedly executed by Nelson—especially the title card to the truck.[2]

On September 24, Mary Granthum accompanied Hannuksela when he drove from their home in Prescott, Wisconsin, to the Gilbert area. A short distance outside of Gilbert appellant turned onto a rough road, parked by some railroad tracks, got out of the vehicle leaving Granthum behind in it, and walked alone down the tracks away from Gilbert. He was gone five or ten minutes before returning to the vehicle.

On September 28, while inspecting mine dumps and tree plantings at an abandoned mine pit near Gilbert, Raymond Svatos came upon several cardboard boxes containing personal items including a Bible, military discharge papers, vehicle title papers, and clothing belonging to Arthur Nelson. He reported his find to the BCA. The following day a BCA agent collected and inventoried 56 items from the dump site. A number of the items found had Arthur Nelson's name on them.[3]

2. At trial a documents examiner for the Minnesota Bureau of Criminal Apprehension (BCA) testified that in her opinion no significant indication existed that Nelson's signature on the title card was genuine, but rather there existed good indications that the signature had been written by appellant.

3. Among items collected was a cardboard box lid which had a partial shoe print on it. A BCA forensic scientist later compared the print with one of appellant's shoes, and concluded that

While setting traps along railroad tracks in a wooded area near Gilbert on November 1, Mark Samich discovered human remains at the bottom of a steep embankment. The remains consisted of human bones, clothing, eyeglasses with Arthur Nelson's imprinted name on them, and a set of dentures. Nearby he found a human skull and two newspapers dated September 5, 1987. In the same general vicinity, BCA investigators later found a sawed-off shotgun which had been sawed off at the pistol grip area and which had cloth and silver duct tape wrapped around the butt.

Subsequently, Nelson's dentist of 25 years identified the dentures as being Nelson's. Also, the deputy medical examiner identified the jaw bone found as that of Arthur Nelson, and the medical examiner identified some small metal particles inside the brain cavity of the skull as being lead shot consistent with a shotgun pellet from which the medical examiner concluded that Nelson's death had resulted from a shotgun wound. Several weeks later Samich found other papers which had Nelson's name on them near a rock pile in the same general area where the remains had been found. Included were a yellow pad of paper dated September 5, 1987, as well as other items, which were in due course turned over to the investigating officers.

Ultimately a St. Louis County grand jury indicted appellant charging him with two counts of first degree murder: one, a violation of Minn.Stat. § 609.185(1) (1988) (premeditated murder) and the other, a violation of Minn.Stat. § 609.185(3) (1988) (intentional killing while committing aggravated robbery). Appellant was subsequently convicted by a St. Louis County petit jury of both counts, but pursuant to Minn.Stat.

§ 609.035 was sentenced to only one mandatory life imprisonment.

## I. The Search Warrant

During the course of the investigation into the death of Arthur Nelson, a Wisconsin police officer applied for and obtained a search warrant from a Wisconsin magistrate. The warrant authorized officers to search appellant's residence for "a brown bi-fold billfold, key ring which has attached to it a four-leaf clover encased in clear plastic, a long gun, or *other personal property belonging to Arthur Walter Nelson or other properties which tend to show evidence of crime.*" (Emphasis added). When the warrant was executed, officers seized ten items[4]—only six of which were admitted into evidence at trial.

Appellant argues that this search warrant was facially invalid as being a general warrant which failed to describe with particularity the items to be seized as required by Amendment IV to the United States Constitution,[5] that the items seized and later at trial admitted in evidence should have been suppressed, and that since they were not, he is entitled to a new trial.

The Fourth Amendment mandates that a search warrant describe the items to be seized with particularity. Thus, "seizure of one thing under a warrant describing another" is precluded, *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (citations omitted), and exploratory rummaging through a person's belongings is likewise prohibited. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

In support of his contention, appellant cites a number of cases in which warrants

"strong evidence" existed that the print was made by appellant's shoe.

**4.** Officers seized: the described key ring, keys that were for the pickup topper, a bolt cutter, two saws, one boot, one Igloo cooler, all of which contained identifying marks showing they were Nelson's. At trial these were admitted in evidence. Also seized by the officers at the time of the search were letters from appellant to his wife, a small baseball bat, one pair of red socks and an orange glove, none of which

were offered in evidence or admitted at the trial.

**5.** Although the warrant in question was issued and executed in Wisconsin, it is subject to the same federal rule of exclusion as if it had been obtained in this state. *State v. Lucas,* 372 N.W.2d 731, 736 (Minn.1985); *cf. Elkins v. United States,* 364 U.S. 206, 224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960).

which appeared to be far more specific than the one here in question have been found to be invalid. Typical of the cited cases is the opinion in *United States v. Spilotro*, 800 F.2d 959 (9th Cir.1986), where the warrant, issued after the submission of a 157 page supporting affidavit, directed a search for:

> Certain property, namely notebooks, notes * * * other records * * * and other items and paraphernalia, which are evidence of violations of 18 U.S.C. § 1084, * * * and which are or may be: (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

*Spilotro*, 800 F.2d at 961. The court of appeals found the warrant lacked the constitutionally required particularity because it omitted a recitation of the precise identity, type or context of the records sought, or, alternatively, failed to identify with sufficient specificity the alleged criminal activities in connection with which the items were sought. *Id.* at 964.[6]

Although in this case the warrant did list with particularity certain items that could be seized by the officers, it contained an added clause permitting search and seizure of "properties which tend to show evidence of crime." This clause appears to be an invitation to permit rummaging through appellant's belongings, and thus fails to protect against a prohibited exploratory general search, *Coolidge v. New Hampshire*, 403 U.S. at 467, 91 S.Ct. at 2038, and it further fails to provide "guidelines to distinguish items used lawfully from those the government had probable cause to seize." *United States v. Spilotro*, 800 F.2d at 964. Because of that lack of specificity, we conclude that insofar as that clause is concerned, the warrant purporting to authorize that type of general search was facially invalid under the Fourth Amendment, and, at the very least, had any items seized pursuant to that clause been offered in evidence they should have been suppressed.

■■■ The question remains, however, whether it automatically follows that all items seized in the search should be suppressed, or whether only those items seized under the authority of that invalid clause of the warrant must be suppressed. In other words, the issue is whether we should apply what has been variously referred to as the doctrine of "severance" or of "partial invalidity." Under the severance doctrine, the insufficient portions of the warrant are stricken and any evidence seized pursuant thereto is suppressed, but the remainder of the warrant is still valid. *See United States v. Krasaway*, 881 F.2d 550, 553 (8th Cir.1989).[7] Consistent with

6. For other cases demonstrating warrants which lacked the particularity required by the Fourth Amendment, see *United States v. Fuccillo*, 808 F.2d 173, 176–77 (1st Cir.) (search warrants for cartons of women's clothing insufficient because defect could have been cured had the government set forth available information about the brand of clothing) *cert. denied*, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); *United States v. LeBron*, 729 F.2d 533, 539 (8th Cir.1984) (warrant authorizing a search for any records which document illegal transactions involving stolen property insufficiently particular because the description failed to particularize the items to be seized and lacked an explanation of a method police could use to distinguish records relating to legal and illegal transactions); *United States v. Abrams*, 615 F.2d 541 (1st Cir.1980) (warrant issued during Medicare fraud investigation for all of doctor's records too broad when a more limited description in terms of both time frame and nature of records could have been given).

7. Neither party discussed the applicability of the law of "severance" or "partial invalidity" in either briefs or at oral argument. If the doctrine were either novel or questionable, it might be appropriate for the court to solicit additional briefs. However, it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be "diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities." Tate, *Sua Sponte Consideration on Appeal*, in Appellate Judicial Opinions 128 (R. Leflar ed. 1974) (originally printed in 9 Trial Judges J. 68 (1970)). *See also* Vestal, *Sua Sponte Consideration in Appellate Review*, 27 Fordham L.Rev. 477, 508–12 (1959). The doctrine of "severance," or "partial invalidity" has been applied by the 1st, 3rd, 5th, 6th and 8th United States Circuit Courts of Appeals. It is

our decisions (cited in n. 7), we think application of the doctrine is appropriate here. Therefore, seizures made pursuant to the valid portions of the warrant are constitutional, and items so seized are not subject to suppression. *See Spilotro*, 800 F.2d at 967. Here, all the items introduced at trial were either individually listed on the warrant or were indisputably the property of Arthur Nelson. Thus, if that clause in the warrant authorizing officers to search for the property belonging to Arthur Nelson was itself valid, the trial court did not err in not suppressing that evidence nor in admitting it at trial.

Concededly, an argument that an authorization permitting search for items belonging to Arthur Nelson is somewhat vague is not entirely meritless. However, under all of the circumstances, we conclude the warrant in this respect met minimal constitutional standards. We have recognized that a warrant need be only as specific as the nature of the material sought will allow. *State v. Ruud*, 259 N.W.2d 567, 573 (Minn. 1977) (warrant authorized an extensive search of virtually all of the business records of a licensed nursing home), *cert. denied, Ruud v. Minnesota*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978); *James v. United States*, 416 F.2d 467 (5th Cir. 1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970), and *cert. denied sub nom. Rolling v. United States*, 397 U.S. 928, 90 S.Ct. 938, 25 L.Ed.2d 108 (1970). A warrant which describes things in broad or generic terms may be valid "when the description is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir.1985) (warrant sufficient when it enables the searcher reasonably to ascertain and identify the things to be seized). *See also United States v. Betancourt*, 734 F.2d 750, 755 (11th Cir.), *cert. denied sub nom. Gerwitz v. United States*, 469 U.S.

1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984), and *cert. denied sub nom. Sando v. United States*, 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984); *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Strand*, 761 F.2d 449, 453 (8th Cir.1985) (degree of specificity dependent upon circumstances of particular case). When the officers applied for the warrant and when it was later executed (Oct. 7, 1987), the officers did not definitely know all of the circumstances surrounding Nelson's disappearance although they were then in possession of sufficient facts to establish probable cause that he was the victim of foul play and that appellant was involved. Though they knew Nelson was wont to keep many of his personal items and tools in his pickup truck, they did not have an itemized list of the specific kinds of personal property which was kept there. The officers also knew that Nelson's truck had been in appellant's possession on September 5 and for several days thereafter, and that some of Nelson's personal property had disappeared from it. Under these circumstances, we hold that the clause of the warrant authorizing a search for Nelson's personal property was adequately specific. All the property which was both seized and introduced in evidence clearly belonged to Nelson. It had been either specifically described in the warrant or Nelson's name was imprinted upon the property itself. Therefore, we hold the trial court did not err in declining to suppress the items seized which had been disclosed with particularity in the warrant and the items on which Arthur Nelson's name had been imprinted. It follows that subsequent admission in evidence was likewise not error.

## II. The Statutory Marital Communication Privilege

■ The trial judge permitted Mary Granthum, appellant's ex-wife,[8] to testify

---

neither new to this court nor questionable. *See State v. Quinn*, 436 N.W.2d 758, 765 (Minn. 1989); *State v. Monsrud*, 337 N.W.2d 652, 660–61 (Minn.1983). In other relevant decisions, we, in effect, have relied upon "severability." *See, e.g., State v. Rodewald*, 376 N.W.2d 416, 422 (Minn.1985) and *State v. Milliman*, 346 N.W.2d 128, 129 (Minn.1984). That the doctrine is not of questionable validity, *see* 2 W. LaFave,

*Search & Seizure* § 4.6(f) (2d ed. 1987). Therefore, we proceed to consider its application in this case notwithstanding that the parties failed to raise or discuss the issue in their briefs or at oral argument.

**8.** Appellant's marriage to Mary Granthum terminated by divorce on October 11, 1988, a num-

about certain conduct, acts, and gestures of the appellant she had observed during the marriage which occurred immediately before and after the disappearance of Arthur Nelson. By motion *in limine* appellant sought exclusion of such testimony altogether, or, alternatively, limitation of its scope so as to exclude evidence of any "communication" between himself and Granthum. In denying that motion, the trial court found that the conduct, acts and gestures which Granthum had observed were not "communications" within the meaning of the marital privilege statute.

Appellant argues on appeal that the trial court's denial of his motion *in limine* and the court's subsequent admission of the Granthum testimony was error because the conduct, acts, and gestures about which she testified were "communications" made in reliance on the confidential nature of the marriage relationship. Minnesota's statute creating the marital privileges is Minn.Stat. § 595.02, subd. 1(a) (1988), which provides:

A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterward, without the consent of the other, be examined as to any communication made by one to the other during the marriage.

Appellant asks us to broadly define the term "communication" as used in the statute to include the types of conduct, acts,

and gestures, about which Mary Granthum was permitted to testify at his trial.

This requires for the first time that we address the precise contention that within the perimeter of the scope of the term "communication" is included all conduct, acts, or gestures which one spouse observes the other make during the marriage.[9]

Though we have never addressed the precise issue raised by appellant's contention, other jurisdictions have, with a resultant divergence of opinion relative to what constitutes a "communication" as that term is employed in similar statutes. One line of cases, represented by *State v. Robinson*, 376 S.E.2d 606 (W.Va.1988), holds that the marital communications privilege prevents disclosure of knowledge derived from observation of the acts or conduct of one's spouse when performed in reliance on the confidence of the marital relation. *Id.* at 610.[10] Under this approach, the test of whether an act comes within the privilege is "whether the act or conduct was induced by or done in reliance on the confidence of the marital relation, i.e., whether there was an expectation of confidentiality." *Id.* Thus, courts employing this analysis emphasize the accused's expectation of confidentiality, and stress that ordinarily disclosure, whether acts or verbal statements, would not have occurred absent the confidence. *People v. Daghita*, 299 N.Y. 194, 199, 86 N.E.2d 172, 174 (1949). "What one may even desire to conceal from all human eyes and ears is thus almost unavoidably

ber of months before appellant's trial. No attempt was made by the state to introduce the contents of any conversations or written communications between Mary Granthum and appellant relative to any facts surrounding Arthur Nelson's death.

**9.** Dicta in *State v. Martin*, 293 Minn. 116, 124, 197 N.W.2d 219, 224 (1972), suggests that a defendant's conduct in the presence of, and admissions to a spouse, should be excluded under the statute. However, in *Martin* the marital privilege was inapplicable because the accused and the witness had never been legally married. Moreover, the spouse's testimony as to conduct was intertwined with testimony as to verbal requests and admissions made by the accused. *Martin*, 293 Minn. at 123–24, 197 N.W.2d at 224.

Thus, it is far from clear that the court's dicta in *Martin* encompassed defendant's nonassertive conduct in the presence of the purported spouse. Additionally, we note that the defendant's "conduct" there in question involved checks taken from the decedent by the defendant, given by him to the purported spouse together with directions to her to cash them. This activity would in all probability qualify as assertive conduct as discussed in the text.

**10.** *See also, e.g., People v. Wilson*, 64 N.Y.2d 634, 636, 485 N.Y.S.2d 40, 41, 474 N.E.2d 248, 249 (1984); *State v. Freeman*, 302 N.C. 591, 598, 276 S.E.2d 450, 454 (1981); *Arnold v. State*, 353 So.2d 524, 526 (Ala.1977); *Osbourne v. Commonwealth*, 214 Va. 691, 692, 204 S.E.2d 289, 290 (1974).

brought within the observation of the [spouse]. The confidence which the law thus *extorts* as well as which it *encourages*, ought to be kept sacred * * *." *State v. Jolly*, 20 N.C. 108, 111 (1838) (emphasis in the original).

On the other hand, courts of other jurisdictions apply a narrower definition of "communication" when the term is used in marital privilege statutes. Generally, these courts construe marital "communication" to include all written or spoken words, acts, and gestures which were intended by one spouse to convey a meaning or message to the other—such communication usually being denominated assertive conduct. *See, e.g., People v. Simpson*, 39 Ill.App.3d 661, 669, 350 N.E.2d 517, 524 (1976), *rev'd on other grounds*, 68 Ill.2d 276, 12 Ill.Dec. 234, 369 N.E.2d 1248 (1977); *see also State v. Hart*, 391 N.W.2d 677, 679 (S.D.1986); *State v. Newman*, 235 Kan. 29, 43, 680 P.2d 257, 266 (1984); *State v. Benner*, 284 A.2d 91, 109 (Me.1971).[11]

Inasmuch as we write "on a clean slate" unobstructed by limiting precedent, we feel free to adopt a construction which seems to best reflect the law's social policy of protecting the marital relationship, *People v. Simpson*, 39 Ill.App.3d at 669, 350 N.E.2d at 524, without erecting artificial "barriers to the ascertainment of truth." *Larson v. Montpetit*, 275 Minn. 394, 402, 147 N.W.2d 580, 586 (1966). In our view, alignment with those jurisdictions employing the narrower analysis best serves both policies.

The public policy served by statutes such as Minn.Stat. § 595.02, subd. 1(a) (1988) "is the protection of marital confidence * * *." *Wolfe v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934). "The privilege has for its object the security from apprehension of disclosure—a security of consequence of which confidences will be freely given and not withheld. The protection, therefore, extends only to *communications*, not to acts which are in no way

communications." VIII J. Wigmore, *Wigmore on Evidence* § 2337 at 657 (McNaughton rev. 1961) (emphasis in the original). Thus, if this policy of affording protection to the serenity of the marital relationship were to be considered in isolation, a strong argument could be advanced justifying a broad construction as contended for by the appellant. However, to give such broad construction to the term "communication," would burden another important social policy—to-wit, one concerned with assuring that a jury in a criminal trial have access to all relevant facts. As stated by the *Simpson* court, "[A] loyal spouse should not, in our view, become a partner in crime with the blessing of the law bestowed through a strained construction of the statute which is said to be supported by a policy of promoting marital bliss." *Simpson*, 39 Ill App.3d at 669–70, 350 N.E.2d at 524.

Furthermore, we observe that the statute immunizes spousal testimony only *after* the marriage has been terminated. At such point, as is the case here, it seems to us that whatever "marital bliss" once existed has already ended. "[W]hatever the merits of [broad construction], its attempted implementation under the guise of a communications privilege can only lead to anomalous results, for the *bulk of the cases involve factual situations in which the marriage has already been destroyed.*" E. Cleary, *McCormick on Evidence*, § 79 at 191–92 (3d ed.1984) (emphasis added). To the contrary, by limiting "communication" to written or oral interspousal communications and nonverbal assertive conduct, both important social policy objectives are served.

Such a narrow construction is likewise consistent with the policy underlying Rule 801 of the Minnesota Rules of Evidence, in which the word "statement," for the purpose of the hearsay rule, is defined as "an oral or written assertion or * * * nonverbal

---

**11.** The federal courts apply a similar rule. *See, e.g., United States v. Estes*, 793 F.2d 465, 467 (2d Cir.1986) (counting and hiding stolen money was not a confidential communication); *United States v. Robinson*, 763 F.2d 778, 783 (6th Cir. 1985) (in RICO prosecution, testimony of ex-

wife that defendant tore up a document not barred by marital communications privilege); *United States v. Smith*, 533 F.2d 1077, 1079 (8th Cir.1976) (placement of package by former husband in wife's underclothing was not communication).

conduct of a person, if it is intended by him as an assertion." Minn.R.Evid. 801(a). In this case the trial court, using the rule definition as an aid to interpreting "communication" as used in the statute, concluded that just as nonverbal, nonassertive conduct is not encompassed within the definition of a "statement," in the rule, it should not be considered a "communication" for the purpose of the marital privilege statute.[12] We agree.

Finally, we observe that the bifurcation found in Minn.Stat. § 695.02, subd. 1(a) supports a construction that "communication" should not include nonassertive, nonverbal conduct. To hold otherwise would afford to testimony concerning conduct, acts, and gestures which are nonassertive the same privilege as to testimony with respect to interspousal assertive communications. To construe "communication" to bar an ex-spouse from testifying as to nonassertive communications would blur the distinction the statute makes with respect to spousal "communication" and ex-spousal "communication." On the other hand, to employ the narrower construction as we choose to do, leaves inviolate the absolute testimonial privilege which exists during the marriage relationship, plus it protects verbal and assertive conduct accruing during the marriage even after its dissolution. When the marriage has already been severed by dissolution, allowing ex-spousal testimony as to nonassertive acts and gestures of the former spouse will in no way undermine the purpose of the statute creating the marital privilege.

We recognize, however, that it will not always be clear whether an act or gesture was intended to be an assertive communication. For example, when a wife observes her spouse doing an action without his knowledge of her observation, the privilege clearly would be inapplicable. However, if the husband does an act or makes a gesture clearly intending to convey a meaning to the wife, such as pointing out the location of a hidden weapon, the privilege may very well attach. As Wigmore notes, the difficult cases are "the in-between ones—those in which the act is done with the knowledge that the spouse is observing but is not a mere substitute for words." VIII J. Wigmore, *Wigmore on Evidence*, § 2337 at 657 (McNaughton rev. 1961).

In some cases—those in which there is something in the way of an invitation by the husband of the wife's presence or attention or there are other indications that he intends for her to acquire knowledge of his act—the act is as much a communication as his words to her describing the act would be. Such an act falls within the policy of the privilege. In other cases, however—those in which the act is done solely for the sake of doing it, the indications being that the husband is indifferent to the presence of the wife—there is no communication and the marital confidence aspect of the act is likely to be slight. In such cases the privilege should not be allowed to deprive the court of the evidence.

*Id.* at 658.

In this case, the acts which Granthum observed and testified about at trial fall into the nonassertive category. She testified she observed that (1) appellant concealed a shotgun in his jacket, (2) he later had Nelson's keys, instant cash card, and unexplained cash, (3) he unloaded Nelson's belongings from the pickup, (4) he entered a building at Point Douglas Park, and (5) he walked in the woods, along a railroad track, near Gilbert. In the context of the circumstances surrounding each of these events, it is difficult to characterize any of appellant's actions as being assertive in nature. Therefore, we conclude the trial court correctly ruled that the inter-

12. The trial court likewise relied upon Minn. Stat. § 645.08(1) (1988), which provides that words undefined within the statute itself should be given their ordinary meaning. Webster's Third New International Dictionary defines communication as "the act or action of imparting or transmitting" or "facts or information communicated." Webster's Third New International Dictionary, 460 (1971). Other, similar, definitions exist, including "the exchange of thoughts, messages, or the like, as by speech, signals, or writing." American Heritage Dictionary, 269 (new college edition, 1980). These authorities seemingly establish that in every day usage the term "communication" carries the narrower connotation.

spousal communication privilege afforded by Minn.Stat. § 595.02, subd. 1(a) (1988) was not applicable to bar Granthum's testimony.

### III. Admission of *Spreigl* Evidence [13]

The trial court, over objection, admitted evidence that in 1982 and 1986 appellant had committed aggravated forgeries and had pled guilty to both offenses. In 1982 appellant forged his employer's name to a personal check and cashed it, and in 1986 appellant took a friend's welfare check and cashed it after forging her endorsement. Statements of appellant admitting such forgeries were made under oath in transcripts which were read to the jury.[14]

■ In reviewing the admission of *Spreigl* evidence, a trial court's ruling will not be disturbed absent a clear abuse of discretion. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984). The accused has the burden to prove that the trial court erred in admitting the evidence and that he was prejudiced by its admission. *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981).

■ To protect a defendant's right to a fair trial, evidence of past crimes independent of those for which the defendant is currently being tried is usually inadmissible. *State v. Black*, 291 N.W.2d 208, 214 (Minn.1980). It may, however, be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in some situations. Minn.R.Evid. 404(b). Even when evidence of past crimes is relevant to prove one of the above mentioned exceptions, it should not be admitted if the probative value is outweighed by its prejudicial impact. *State v. Matteson*, 287 N.W.2d 408, 411 (Minn.1979); Minn.R.Evid. 403. To justify admission, six requirements must be met: (1) the state must give notice of intent to introduce the evidence, (2) the prosecutor must specify the eviden-

tiary exception to the *Spreigl* evidence, (3) if the evidence establishes identity, there must be a time, place or *modus operandi* nexus, (4) the trial court must find the direct or circumstantial evidence in the case is weak, and the evidence of past crimes is necessary to the state's burden of proof, (5) the evidence of the prior acts must be clear and convincing, and (6) the court must give appropriate jury instructions as to the purpose of the evidence. *State v. Matteson*, 287 N.W.2d at 411.

■ Appellant first argues that although the state provided grounds for the exception to the exclusionary rule, the notice was meaningless because the state listed every known exception. He argues that this type of "shotgun notice" does not meet the requirement of specificity. The rules of criminal procedure require that counsel for defendant be notified "of any additional offenses, the evidence of which may be offered at the trial under any exceptions to the general exclusionary rule." Minn.R. Crim.P. 7.02. The prosecutor gave the proper notice on January 27, 1989. The rule does not require that the prosecutor specify under which exception the evidence fits at the time the notice is filed. Rather, "at the time the evidence is offered, the prosecutor shall specify the exception to the general exclusionary rule under which it is admissible." *State v. Matteson*, 287 N.W.2d at 411. At one point during a discussion in chambers, the prosecuting attorney said the evidence was being admitted to prove common scheme, proof of intent, and proof of knowledge of the circumstances. A bit later, he said: "I want the record to reflect, Judge, that the grounds which it has been offered are motive, intent, preparation, planning, knowledge, identity, absence of mistake or accident, in the case." Although arguably this offer has some of the earmarks of a general listing of exceptions, we are unable to con-

---

**13.** If, at trial, the state intends to introduce evidence of other crimes committed by the accused for certain limited purposes, the state must, before trial, afford to the accused notice of such intention. *See State v. Spreigl*, 272 Minn. 488, 496–97, 139 N.W.2d 167, 173 (1965),

*State v. Billstrom*, 276 Minn. 174, 178, 149 N.W.2d 281, 284 (1967).

**14.** The court denied the State's request to present *Spreigl* evidence on four other offenses involving burglary and robbery.

clude that the trial court abused its discretion in admitting the evidence. As the court stated, the evidence of the forgeries was particularly probative of the "knowledge of intent * * *."

■ Appellant also contends that the trial court failed to find that the evidence of prior forgeries was needed to sustain the state's burden of proof, and that even if it did, the evidence did not fall within any of the exceptions to the exclusionary rule. We disagree. The trial court may not have articulated the exact words "sustain the state's burden of proof," but it did make such a finding—to-wit, that there was a question of whether Arthur Nelson had signed the title to the pickup or whether appellant had forged his signature. Disputed evidence on the point existed. Thus, the evidence of the prior forgeries was relevant to prove motive, intent, and *modus operandi*, and also, we note that some question existed as to the state's ability to meet its burden of proof with respect to intent. Therefore, we hold that the trial court did not abuse its discretion in admitting the *Spreigl* evidence.

Accordingly, we affirm appellant's first degree murder conviction.