**In re GRAND JURY SUBPOENA UNITED STATES of America, Appellee,**

**Hana Koecher, Defendant-Appellant.**

**No. 969, Docket 85–1033.**

United States Court of Appeals, Second Circuit.

Submitted Feb. 14, 1985.

Decided Feb. 28, 1985.

Michael Kennedy, Michael Kennedy, P.C., Joseph Calluori and Gregory M. Byrne, New York City, for defendant-appellant.

Bruce A. Green, Asst. U.S. Atty., S.D. N.Y., Rudolph W. Giuliani, U.S. Atty., Garry A. Bohrer and Stacey J. Moritz, Asst. U.S. Attys., S.D.N.Y., New York City, for appellee.

Before FRIENDLY, VAN GRAAFEILAND and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge.

The criminal proceeding out of which this appeal arises had its origin in a complaint of Kenneth M. Geide, a Special Agent of the Federal Bureau of Investigation (FBI), charging Karl (in fact Karel) F. Koecher, with conspiring with other unnamed persons to communicate national defense documents and information to a foreign government in violation of 18 U.S.C. § 794(a) and (c). On November 27, 1984, Karel Koecher was arrested pursuant to a warrant. In an affidavit sworn to on the same day, Special Agent Geide alleged that Hana Koecher,

Karel's wife, had participated with her husband in secret meetings with the intelligence service of the foreign government, had delivered classified United States national defense information obtained by Karel to agents of the foreign government intelligence service, had acted as a courier for that service, and had received payments from it for information and documents she had delivered. The affidavit also alleged that Hana was about to depart from the United States for Europe. A warrant issued for the detention of Hana as a material witness, and she was subpoenaed to appear before a grand jury that was investigating the complaint. She was asked certain questions, set forth in the margin, in regard to having done the acts alleged in the affidavit in support of the material witness warrant.[1] In response to each question, after consulting with her lawyer, she declined to answer

> on the ground that to do so could adversely affect the interest of my husband, Karl Koecher, and I might destroy the harmony of our 21 years of marriage. Also, the answer could violate the privilege against disclosure of confidential communications between my husband and me.

The Assistant United States Attorney advised her that in the Government's view the grounds stated did not justify her refusal to answer and asked whether there was any other ground for her refusal. After again consulting with her lawyer, Mrs. Koecher repeated the same formulation she had used before. The performance was repeated after Mrs. Koecher was warned that continued refusal to answer could result in the court's ordering her imprisonment under 28 U.S.C. § 1826(a). The grand jury authorized the United States Attorney to ask that she be held in civil contempt. At an adjourned hearing on December 4, 1984, Judge Palmieri overruled

the claim of marital privilege, explaining his reasons in an oral opinion, and after proceedings not challenged for irregularity, ordered that Mrs. Koecher be committed to jail for a period of 18 months or for the life of the grand jury or until such time as she purged herself by answering the questions, whichever period was shortest. Mrs. Koecher appealed from that order. Judge Palmieri amplified his views in a thoughtful written opinion filed on December 11, 1984, 601 F.Supp. 385; the basis for his judgment was that the marital privilege was subject to an exception for joint participation in criminal activity, a view announced in *United States v. Van Drunen,* 501 F.2d 1393 (7 Cir.), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974); and followed in *United States v. Trammel,* 583 F.2d 1166 (10 Cir.1978), *aff'd on other grounds,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); and *United States v. Clark,* 712 F.2d 299 (7 Cir.1983), but rejected by *Appeal of Malfitano,* 633 F.2d 276 (3 Cir.1980).

While the appeal was under advisement, the Government notified us, by letter dated December 20, 1984, that the grand jury had on that day filed a one-count indictment charging Karel F. Koecher with conspiring to violate 18 U.S.C. § 794(c) but that the grand jury was continuing an investigation, for which it believed Hana's testimony was critical, to develop the full scope of Karel's activities. Two of the overt acts in the indictment were that in the spring of 1975 Karel gave a package that concealed a classified document to Hana and instructed her to deliver it to the CIS and that Hana, pursuant to such instructions, had made such a delivery. Hana's counsel responded with a letter arguing that, with Karel now indicted, the Government was seeking to utilize the grand jury to prepare its case against Karel for trial, and requesting us to vacate

---

1. Q. Mrs. Koecher, did you ever deliver classified information relating to the national defense of the United States to the Czechoslovakian Intelligence Service?

   Q. Mrs. Koecher, have you ever received money from agents of the Czechoslovakian

Intelligence Service as payment for information and documents that you delivered to them?

   Q. Mrs. Koecher, have you ever met with agents of the Czechoslovakian Intelligence Service?

the judgment of contempt on that ground. On December 28, 1984, we filed an unpublished order vacating the judgment of contempt without reaching the merits; the pertinent portion of this judgment is reproduced in the margin.[2]

Because of Judge Palmieri's unavailability to conduct the proceedings on remand, the matter was transferred to Judge Wyatt. On January 14, 1985, the Government submitted to him a letter of Assistant United States Attorney Green, a memorandum of law, and an affidavit of O.E. Kotlarchuk, a trial attorney of the Department of Justice. Copies of the two former were served upon counsel for Mrs. Koecher, but the latter was considered by the judge *ex parte*.[3]

Judge Wyatt filed an opinion on January 21, 1985. This recited that:

The government has submitted *ex parte* an affidavit of a Trial Attorney in the Internal Security Section of the Criminal Division of the Department of Justice. This affidavit states that the affiant's Section supervises investigations and conducts prosecutions of cases concerning the national security. As disclosed by me to counsel for Hana, this affidavit states that the grand jury investigation continues after the return of an indictment against Karel for the purpose of considering whether other offenses than that in the one count indictment should be charged against him and whether charges should be made against potential defendants other than Karel.

More elaborately, on the basis of the affidavits in support of the applications for warrants to arrest Karel and Hana and in the testimony of Special Agent Geide before Magistrate Grubin during a bail hearing concerning Karel on December 4, 1984, he found as follows:

Karel in Czechoslovakia was recruited in 1962 by the Czechoslovak Intelligence Service [CIS]. In the period 1963–65 he was trained and briefed to be sent to this country as an officer of the CIS.

Karel was employed by the CIA for a period of time beginning in February 1973 and continuing until at least August 1975. He had access to classified documents and in the period stated passed to the CIS classified and other information and documents which he learned [of] or obtained by reason of his CIA employment.

Judge Wyatt concluded that "[c]onsidering the long period of time spent by Karel and Hana in this country on an admitted espionage mission for a foreign intelligence service, it would appear that the indictment against Karel barely scratches the surface." He thought it would be reasonable that the grand jury would wish to develop evidence that would support the indictment of additional conspirators and the inclusion of substantive counts. He therefore determined that "the sole or dominant purpose of further questioning of Hana by the

---

**2.** It is settled law that

It is not permissible for the prosecutor to subpoena and question potential trial witnesses to an existing criminal proceeding where it is the sole or dominant purpose of such questioning to obtain evidence for use in the upcoming trial. Simply stated, it is not a legitimate function of the grand jury to serve as a substitute for pretrial discovery.

8 Moore's Federal Practice ¶ 6.04[5] at 6–86 (1984). *Accord,* 1 Wright Federal Practice and Procedure, Criminal 2d § 111.1 at 321 (1982). Decision whether this case falls within that principle depends on facts concerning the grand jury's investigation which were not pertinent at the time of Judge Palmieri's decision and are not before us. Accordingly we vacate the judgment of civil contempt, without considering whether it was properly issued on the facts then before the judge, and remand the case to the District Court for the Southern District of New York so as to enable Judge Palmieri to determine, as promptly as feasible, the issue raised by Karl F. Koecher's indictment. The Judge should also consider whether the particular questions asked by the Government which Mrs. Koecher refused to answer fall within the scope of the privilege, assuming that one exists. Meanwhile Mrs. Koecher will remain subject to the warrant of arrest as a material witness. This panel reserves jurisdiction.

**3.** We have not read the affidavit or considered it except for Judge Wyatt's characterization of it. On the grounds on which we place decision it is not material.

government before the grand jury is not to obtain evidence for use at the trial of Karel on the one-count of the present indictment." The Government requested Judge Wyatt to issue a new judgment of contempt against Hana but the judge declined to do this, believing that he had no jurisdiction. Instead he directed the Government to transmit the record of the proceedings to this court. Accordingly, the Assistant United States Attorney forwarded to us a batch of papers including Judge Wyatt's opinion. After our informing counsel that we did not consider that anything was before us because we had vacated Judge Palmieri's order and Judge Wyatt had made none, further proceedings took place in the district court.

On January 30, 1985, Judge Wyatt heard argument on yet another motion by the Government for a judgment of contempt. He noted that he had received a letter from Mrs. Koecher saying that she would rather die in prison than give any testimony detrimental to her husband. In view of this he thought it would be a waste of time to have Mrs. Koecher appear again before the grand jury. He repeated the three questions, *see* note 1 *supra*, and Mrs. Koecher again refused to answer. He thereupon held her in contempt, implicitly adopting Judge Palmieri's views with respect to a joint participation exception to the marital privilege, and she has again appealed.

Appellant asks us to vacate the judgment of civil contempt on a number of grounds— (1) that the district court in effect found that Mrs. Koecher would never testify against her husband, (2) that Judge Wyatt erred in ruling that Mrs. Koecher's testimony was not being sought for the sole purpose of obtaining evidence against her husband, (3) that Mrs. Koecher was denied due process by having been refused access to her statements to the FBI which allegedly would demonstrate her inability to provide the information ostensibly sought by the

Government, (4) that the court should not recognize a joint participant exception to the marital privilege, and (5) that the Government has failed to establish a factual basis for the exception if one exists.

We find it unnecessary to decide any of these points except for the fourth, since we hold, in agreement with the Third Circuit and in conflict with the Seventh and Tenth Circuits, that the marital privilege is not subject to a joint participant exception.[4]

As explained in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Court's latest relevant pronouncement on the subject, and elsewhere, "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience," F.R.E. 501, recognize two different testimonial privileges having their source in marriage. One, the privilege against disclosure of confidential communications between spouses, a privilege which can be invoked by either spouse, is not pertinent in this case since it was conceded in the district court and here that the questions involved no confidential communications, as the most cursory inspection of them makes apparent. The other, as now defined in *Trammel, supra*, vests a witness with a privilege not to testify adversely to a spouse; "the witness may be neither compelled to testify nor foreclosed from testifying." 445 U.S. at 53, 100 S.Ct. at 914.

In ruling that Mrs. Koecher could nevertheless be compelled to testify, the district court followed decisions in the Seventh and Tenth Circuits making an exception for cases in which the spouses are joint participants in a criminal enterprise to which the questions relate. The explicit enunciation of the exception was in *United States v. Van Drunen*, 501 F.2d 1393, 1396 (7 Cir.), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974).[5] *Van Drunen* was ac-

---

**4.** The Government does not dispute that the questions asked of Mrs. Koecher were within the marital privilege unless withdrawn therefrom by an exception for joint participation in crime.

**5.** Since the witness-spouse apparently testified voluntarily, there would have been no need for the *Van Drunen* court to create the exception had it been able to foresee the Supreme Court's adoption of the rule announced six years later

cepted by the Tenth Circuit over a strong dissent in *Trammel*, 583 F.2d 1166 (1978), where, as in *Van Drunen*, the spouse testified voluntarily. When the Supreme Court came to decide *Trammel*, it made no mention of the ground on which the Court of Appeals had relied. It said that it had granted certiorari "to consider whether an accused may invoke the privilege against adverse spousal testimony so as to exclude the voluntary testimony of his wife," 445 U.S. at 41–42, 100 S.Ct. at 908, and, answering that question in the negative by partially overruling *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), affirmed the Court of Appeals, without reserving the question whether a joint participation exception would be recognized in a case where the witness-spouse claimed the privilege. The Seventh Circuit has continued to follow *Van Drunen* subsequent to the Supreme Court's decision in *Trammel, see United States v. Clark*, 712 F.2d 299 (1983), although, as in *Van Drunen*, the *Clark* decision also rested on the point that the facts about which the spouse's testimony was sought to be compelled antedated the marriage, 712 F.2d at 302. On the other hand, the Third Circuit, in a post-*Trammel* opinion, rejected the exception, *Appeal of Malfitano*, 633 F.2d 276 (1980). In *United States v. Archer*, 733 F.2d 354, 359 n. 3, *cert. denied,* —— U.S. ——, 105 S.Ct. 196, 83 L.Ed.2d 128 (1984), the Fifth Circuit stated that it had "not yet considered, and need not today, whether a 'joint crimes' exception ... might limit the adverse spousal testimony rule in *Trammel*."

Appellant asks us to rule that *Trammel* rejected the joint participation exception. While we would have difficulty in going to that extreme, we nevertheless agree that the Supreme Court's action in *Trammel* has some negative implications as regards the joint participant exception. If the Supreme Court looked on the exception with favor, it is somewhat peculiar that it should not have decided the case on that ground

rather than making the much broader assault upon the privilege involved in confining the privilege to the witness-spouse, thereby requiring a partial overruling of a decision little more than twenty years old. Also one would have expected the Court at least to have indicated that the exception might still make the privilege unavailable even when the witness-spouse asserted it.

A principal reason for the exception adopted in the *Van Drunen* opinion was that the goal of preserving the family "does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or co-conspirator he is creating another potential witness," 501 F.2d at 1396. Whatever the force of this argument when the Seventh Circuit decided *Van Drunen* and the Tenth Circuit decided *Trammel*, this rationale for the exception has been largely undermined by the Supreme Court's decision in *Trammel*. A person desiring to enlist the aid of his spouse as an accomplice cannot now be sure that he is not creating another potential witness; he takes the risk that the spouse may choose to testify. A second reason offered in *Van Drunen*, that in circumstances of joint participation in crime the marriage is unlikely to be "an important institution contributing to the rehabilitation of the defendant spouse," 501 F.2d at 1397, does not strike us as especially forceful; rehabilitation had never been regarded as one of the interests served by the spousal privilege and, so far as it is a factor, participation in a joint crime would not necessarily remove the remorse which would trigger rehabilitation. We also are unable to accept the proposition that a marriage cannot be a devoted one simply because at some time the partners have decided to engage in a criminal activity. This is especially true with respect to political offenses, as witness some celebrated cases in this very court. In short, while it may well be that the marital privilege should be abol-

---

in *Trammel* that only the witness-spouse can claim the marital privilege. Additionally the joint enterprise exception was an alternative

ground, the court also relying on the point that the testimony concerned events prior to the marriage.

ished, we do not see sufficient reason for creating a joint participation exception, particularly in the light of *Trammel.*

We do not mean that there is not something to be said on the other side. The Government relies on the well-recognized exception to the attorney-client privilege for communications made to an attorney for advancing criminal ends, *see, e.g., In re John Doe Corp.,* 675 F.2d 482, 491 (2 Cir. 1982), and, more particularly, on decisions of courts of appeals excepting from the confidential marital communication privilege statements made for such a purpose. The exception to the attorney-client privilege is rather easily distinguished. The attorney-client relationship, valuable as it is, is hardly of the same social importance as that of husband and wife. Here, as said in *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965):

> We deal with a right of privacy older than the Bill of Rights.... Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.

With respect to the exception to the marital communications privilege, in none of the four cases cited by the Government, *United States v. Entrekin,* 624 F.2d 597, 598 (5 Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981); *United States v. Ammar,* 714 F.2d 238, 257–58 (3 Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Kapnison,* 743 F.2d 1450, 1455 (10 Cir. 1984); *United States v. Neal,* 743 F.2d 1441, 1446 (10 Cir.1984), did the courts use the joint participation exception to force an unwilling spouse to testify concerning confidential marital communications, and the Tenth Circuit cases, *Kapnison* and *Neal,* carefully limited the exception to instances where the testimony is "by consent of the witness spouse." The Third Circuit perceives no contradiction between its holdings in *Malfitano, supra,* 633 F.2d at 280, that there is no exception to the general spousal privilege for criminal activity and in *Ammar, supra,* 714 F.2d at 257–58, "that communications between spouses pertaining to ongoing or future criminal activity, are not protected against disclosure by the privilege for confidential marital communications."[6] The *Ammar* court saw a difference between the rationales underlying the confidential communications privilege and the adverse spousal testimony privilege. The former seeks to protect the intimacy of private marital communications and courts have concluded that discussions of criminal activity can be excluded from that protection. *See, e.g., United States v. Kahn,* 471 F.2d 191, 194 (7 Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). The latter is more broadly aimed at protecting marital harmony and the Third Circuit reasoned that compelling a spouse to testify under a joint participants exception could create ex-

---

**6.** Other cases cited by the Government, *United States v. Kahn,* 471 F.2d 191 (7 Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *United States v. Mendoza,* 574 F.2d 1373 (5 Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Broome,* 732 F.2d 363 (4 Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 181, 83 L.Ed.2d 116 (1984); *United States v. Shipp,* 578 F.Supp. 980 (S.D.N.Y.1984), involved the admission of out-of-court statements made by a spouse to a third party or over a tapped telephone. Accordingly, in none of these cases was the court faced with the spectacle of a witness being compelled by the government actually to testify against her spouse. Moreover, the admission of the spouse's adverse statements through the testimo-

ny of a third party witness or through tapes of intercepted conversations was thought to reduce the danger of generating marital friction by providing a "convenient buffer" between the spouse and the damaging testimony. *See, e.g., United States v. Mackiewicz,* 401 F.2d 219, 225 (2 Cir.), *cert. denied,* 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968). Where the spouse is not a witness, and the testimony recounts statements made to third parties or in furtherance of the joint criminal enterprise, the non-witness spouse would have to possess undue sensitivity to allow a marriage to be impaired by the admission of the evidence. *See United States v. Price,* 577 F.2d 1356, 1365 (9 Cir.1978), *cert. denied,* 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979).

actly the negative impact on the marriage that the privilege was designed to avoid. *See Malfitano, supra,* 633 F.2d at 279 n. 5.

Another factor inclining us to reject a joint participation exception to the spousal privilege is the difficulty often encountered in establishing the predicate without invading the privilege.[7] This case is a good example. There is, to be sure, basis for a reasonable inference from the Koechers' alleged training in Czechoslovakia and their long life together in the United States, where Karel was employed by the CIA, to a conclusion that Hana was aware of what Karel was doing. However, the Government has made no criminal charges against Hana, and her counsel alleges that in long interviews by the FBI she asserted that Karel kept his doings to himself.

The marital privilege rests upon "its perceived role in fostering the harmony and sanctity of the marriage relationship," *Trammel,* 445 U.S. at 44, 100 S.Ct. at 909, *see also id.* at 53, 100 S.Ct. at 913, and the *"natural repugnance* in every fair-minded person to compelling a wife or husband to be the means of the other's condemnation, and to compelling the culprit to the humiliation of being condemned by the words of his intimate life partner," 8 Wigmore, *Evidence* § 2228 at 217, (emphasis in original),[8] forced from her by governmental compulsion. In light of its existence since the early days of the common law and of the importance of the interests which the marital privilege serves, we would leave the creation of exceptions to the Supreme Court or to Congress.

We therefore vacate the order finding Mrs. Koecher in contempt. Issuance of the mandate is stayed pending the disposition of a timely petition for rehearing by the Government and, if such a petition is not timely filed or is denied, for an additional fourteen days to permit the filing of a petition for certiorari and a motion for a

stay and, if such a motion is filed, pending the disposition thereof.

---

7. As Chief Judge Seitz observed in *Appeal of Malfitano, supra,* 633 F.2d at 279: "Ironically, the closer the marriage, the more likely it will appear that both spouses are involved."

8. Although Wigmore characterizes this argument as "the real and sole strength of the opposition to abolishing the privilege," *id.,* he rejects it.