**STATE of Minnesota, Respondent,**

v.

**Michael Sean GIANAKOS, Appellant.**

**No. C6–00–1691.**

Supreme Court of Minnesota.

May 23, 2002.

John M. Stuart, Minnesota State Public Defender, Melissa Sheridan, Assistant State Public Defender, St. Paul, for Appellant's.

Mike Hatch, Minnesota Attorney General, Natalie E. Hudson, Assistant Attorney General, St. Paul, Lisa Borgen, Clay County Attorney, Moorhead, for Respondent's.

## OPINION

STRINGER, Justice.

On May 7, 1997, the body of Anne Marie Camp (Camp), the victim of an apparent homicide, was discovered on an abandoned farmstead in Clay County, Minnesota. A lengthy investigation eventually led authorities to suspect appellant and his wife, Jamie Dennis-Gianakos. The couple had married on February 14, 1997, at least in part for the purpose of invoking the mari-

tal privilege if charged in a motel robbery they had staged 18 days earlier. Approximately two weeks after their marriage, appellant and Jamie were charged in the robbery; appellant confessed, but Jamie pleaded not guilty. Appellant and Jamie learned that Camp was the state's key witness, and on May 1, 1997, Camp disappeared. Her body was found six days later.

On October 28, 1999, appellant and Jamie were indicted on charges of first-degree murder, conspiracy to commit first-degree murder, and aiding first-degree murder [1] in Camp's death. Jamie pleaded guilty as part of a plea bargain agreement and, over appellant's marital privilege objection,[2] testified for the state at appellant's trial. Following a jury trial, appellant was convicted on all counts and sentenced to life in prison. The issues presented on appeal are whether the trial court erred in allowing appellant's wife Jamie to testify against him despite his request that her testimony be excluded based on the marital privilege set forth in Minn.Stat. § 595.02, subd. 1(a), whether there is sufficient evidence to support his conviction, and whether the trial court erred in failing to instruct the jury sua sponte that a conviction cannot rest on the uncorroborated testimony of an accomplice. We reverse and remand.

At the time of her death, Camp was a friend of appellant and his wife Jamie. Camp also babysat for the couple's children[3] on occasion, including the night of January 27, 1997, when Jamie and appellant staged a robbery at a nearby motel where appellant was employed. Appellant confessed to the robbery, minimizing Jamie's role in the crime.

On February 14, 1997, following a 17-month courtship, Jamie and appellant married. There is a discrepancy in the record regarding the motivation for and timing of their marriage: in appellant's initial statement to authorities he indicated that the reason they got married when they did was so that they could not be forced to testify against one another; he later clarified his statement by claiming that what he meant was that avoiding adverse testimony was part of his reason for marrying Jamie, but that he also married her because he loved her. Jamie was more consistent in her testimony, acknowledging the marriage was a "sham" and claiming that the purpose of their marriage was to prevent her and appellant from having to testify against each other. The evidence also indicated that their marriage had been contemplated a year earlier when the couple began attending premarital classes at church, but the idea was dropped when Jamie became pregnant. Appellant said Jamie told him she "didn't want to be fat in a dress" and that "it was just a piece of paper anyway."

In any event, both admitted the marriage was at least partially motivated by their desire to take advantage of the privi-

1. As defined by Minn.Stat. §§ 609.185 (1996), 609.175 (2000), and 609.05 (2000), respectively.

2. Appellant objected to Jamie's testimony based on Minn.Stat. § 595.02, subd. 1(a) (2000), which provides:

   A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the mar-

riage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage.

3. Appellant and Jamie were raising two children under two years old at that time; the oldest was Jamie's from a previous relationship, later adopted by appellant. The youngest was appellant's and Jamie's biological child.

lege against adverse spousal testimony with respect to their anticipated robbery charges, ultimately filed against them on February 27, 1997. Jamie pleaded not guilty, and as her trial for the robbery approached, she and appellant became aware that Camp had made various statements to police regarding Jamie's activities the night of the robbery. In fact, Camp was the only person who knew that Jamie had left her apartment on the night of the robbery. Jamie was ultimately convicted of robbery.

Initially, appellant and Jamie were not suspects in Camp's murder and did not become the focus of the investigation until September 1998, more than a year later, when appellant's family contacted authorities indicating that they had information regarding the Camp murder. In their recorded statements to police and in subsequent trial testimony, appellant's parents explained how appellant had called them on the telephone crying and upset, purportedly having just read an entry in one of Jamie's journals detailing the murder of Camp. Appellant's mother claimed that appellant told her he was living with a murderer and that he thought his wife shot Camp. Appellant's father testified that appellant, seemingly reading directly from an account of Camp's murder written by Jamie, conveyed statements about giving Camp some pills that did not kill her, not being able to shoot her because she was stumbling around "woozy," noting that her throat was slashed, and indicating that Jamie wore latex gloves while putting a butcher knife with appellant's prints on it into a plastic bag and burying it.[4] Appellant's father encouraged appellant to save the book and go to the police with it.

Based on this information appellant's home was searched and although some journals belonging to Jamie were seized, including one that made reference to Camp "haunting" her, none contained the specific statements appellant had shared with his parents.[5] Nonetheless, authorities found appellant's statements significant because at this time in the investigation, the only information that had been released to the public regarding Camp's murder was that she was killed on or about May 1, 1997, and that she had suffered a gunshot wound to the head. Investigators knew that any additional information about Camp's death, such as the fact that her throat had been slashed, would only be known to those somehow involved in the murder. But appellant's statements regarding the pills confused investigators and prompted them to order a more in-depth lab analysis than that originally performed in conjunction with the autopsy.[6] The results of this subsequent analysis revealed a concentration of doxylamine succinate in Camp's system—a drug common in sleep aids—equal to approximately 85 times the normal prescribed dosage. Experts testified that such high quantities would have significantly debilitated Camp, physically and

---

4. In his statement to police, appellant stated that no specific names were provided in Jamie's writing, but that it was a "story" about a husband and wife who had participated in a murder.

5. Although appellant initially told authorities that he, too, had been looking for the diary, later in the investigation he told them there was no such book and denied making any call to his parents about it. He denied everything when later confronted by Jamie, referring to his mother as a "big liar" and claiming that his mother was just making things up.

6. Although the medical examiner's initial report indicated that the drug doxylamine succinate was present in Camp's urine, the exact amount was not determined as its presence, indicative of the consumption of any number of over-the-counter medicines, was thought not to be particularly significant at the time.

mentally, making walking very difficult and perhaps even causing death.

On June 11, 1999, Jamie began serving her sentence at the Shakopee correctional facility for a probation violation. Investigators obtained permission to monitor Jamie's calls and those coming in and out of the Gianakos home, hoping they might reveal new potential witnesses or other information helpful in solving the case. Investigators also interviewed Jamie but she remained silent on the advice of appellant. Eventually however, with the news that appellant's parents had made statements to authorities implicating her and that a grand jury was being convened to seek a first-degree murder indictment against her and appellant, Jamie testified that she could no longer take the pressure. On October 21, 1999, Jamie confided in a fellow inmate about Camp's murder, and the inmate subsequently contacted investigators and reported the details of the Camp murder as conveyed to her by Jamie.

On October 28, 1999, a grand jury indicted appellant and Jamie for first-degree murder, conspiracy to commit first-degree murder, and aiding first-degree murder. Appellant pleaded not guilty and opposed the state's motion to prohibit him from invoking the marital privilege. The trial court ultimately ruled that Jamie could testify against appellant relying principally on federal case law recognizing exceptions to the marital privilege on grounds that the marriage was not entered into in good faith and that the couple was engaged in joint criminal activity.[7]

At appellant's trial, Jamie testified against him as part of a plea agreement. According to Jamie, Camp's potentially damaging statements to police regarding the motel robbery motivated them to take Camp out to an old farmstead appellant was familiar with on May 1, 1997, to scare her into changing her story. In preparation for the trip, Jamie testified that she purchased wine coolers she knew Camp liked hoping to "lighten the mood." Jamie claimed she later saw appellant crushing sleeping pills into one of the wine cooler bottles to help "confuse" Camp during the planned confrontation, and that Jamie and appellant discussed how they could offer the bottle to Camp, already opened, so she would not be suspicious of the cap's broken seal. Store records also indicate appellant purchased a .12 gauge shotgun on May 1, 1997, although Jamie claimed she was not aware of any gun until she saw appellant with it at the farmstead.

Jamie testified in detail as to what happened on the evening of May 1, 1997, when she, appellant and their two children drove Camp out to the farmstead under the pretense of showing Camp some property appellant and Jamie were thinking of buying. Jamie explained that she gave Camp the drugged wine cooler to drink during the drive and that appellant pretended to be lost so the drugs and alcohol would have time to take effect. Jamie claimed that they arrived around 8:30 p.m., just as it was getting dark, and that Jamie, Camp, and the children went into the abandoned farmhouse to look around until appellant eventually called for them to leave. Camp was walking very slowly by this time. As Jamie reached the car, she saw appellant come up behind Camp from the back of the house with a shotgun in his hand. Jamie then heard the gun go off and saw Camp fall. According to Jamie, appellant proceeded to put on some rubber gloves,

7. In determining that these exceptions were applicable, the trial court noted that both appellant and Jamie had made statements suggesting their marriage had a purposeful connection to the staged robbery, and that the evidence demonstrated that they were joint participants in the activities which led to the indictment for the murder of Camp.

instructed Jamie to do the same, and the two of them dragged Camp's body face down behind the house. Once behind the house, they rolled the body over face up and appellant told Jamie to get a knife from the car and cut Camp's throat. Jamie testified that she refused, went back to the car, and after noticing one of their kitchen knives under the front seat, looked up to see appellant standing over Camp and firing the shotgun toward her head.

Jamie testified that she and appellant then went home, Jamie drove to Camp's apartment to retrieve Camp's purse, and upon her return home appellant drove off with the purse. According to Jamie, appellant called about forty-five minutes later from his parent's house to say that he had removed evidence from the farmstead that could connect them with the crime and that he had thrown the contents of Camp's purse along the road. Jamie also testified that he told her he had "broken down" the gun and gotten rid of it. Appellant returned home around 12:30 a.m., and the couple later agreed that, if asked, they would say they were shopping that night.

Appellant testified to a very different story about the events of May 1, 1997. Contrary to Jamie's testimony regarding a joint "plan," appellant claimed he was not involved in any way with Camp's death. Although his testimony revealed some confusion about whether or not he was with Jamie on the evening of May 1, 1997, he admitted to being present when the wine coolers were purchased and to buying the .12 gauge shotgun which he claimed was for Jamie's protection during his impending incarceration for the motel robbery. Jamie contradicted appellant's testimony on this point, stating that she didn't like guns and was not concerned about security during appellant's upcoming imprisonment.

In any case, appellant testified that Jamie and the girls then went to the house of Jamie's mother near Detroit Lakes where she could practice using the new .12 gauge shotgun. According to appellant, Jamie returned late that evening without the gun, explaining that she was concerned about transporting it without a case. Meanwhile, appellant claimed he spent most of the evening—approximately 9:15 p.m. until 12:15 a.m.—keeping his father company in his mother's absence. His parents testified to the same effect.

The medical examiner and others assisting in the investigation also testified at appellant's trial, describing the condition of Camp's body and the evidence found at the scene. A massive head wound was apparent to arriving authorities, and abrasion marks on Camp's torso as well as grass caught under her pushed up bra and jacket suggested that the body had been dragged by the feet face down to its current position just north of the farmhouse. Both the medical examiner and an investigator with the Bureau of Criminal Apprehension testified that it was likely that at least two people were present at Camp's murder because, considering Camp's weight and the fact that she was probably already dead or at least unconscious at the time she was moved, it would have been extremely difficult for one person to drag her body to the place where it was found. Camp's throat had been slashed and a shotgun wad was found entangled in her hair. Blood spatter analysis of the north wall of the farmhouse indicated that the trauma to the head was probably inflicted in approximately the same location and position in which the body was discovered, lying face up about four feet from the house. Shotgun pellets found in and near Camp's body were consistent with those fired from a .12 gauge shotgun. A search of the surrounding area uncovered a pack of cigarettes, Camp's wallet and its scattered contents, and a pair of latex gloves.

Routine lab analysis revealed a blood alcohol level of .031 grams per deciliter, a level consistent with having consumed about one wine cooler, and indicated the presence of a common antihistamine, doxylamine succinate, in her urine. At the time of the initial autopsy, the medical examiner concluded that a shotgun wound to the front of the head was the cause of death and that Camp was probably already dead when the neck wound was inflicted. Later in the investigation the high level of doxylamine succinate discovered in Camp's system was added as a competing cause of death.

A farm neighbor who was outside on the evening of May 1, 1997, provided independent testimony of some events relating to the commission of the crime. He testified to seeing an unfamiliar car drive past at approximately 9–9:30 p.m., and turn into the farm where Camp's body was later found. He subsequently heard a gun shot from that direction on his way into the house. Investigators measured tire tracks found at the scene in an attempt to identify a vehicle make and model, but no conclusive match could be made.

The jury ultimately found appellant guilty of all charges and he was subsequently sentenced to life in prison.

## I.

■■ We first consider whether our jurisprudence supports a denial of the marital privilege in cases where one of the reasons the couple chose to marry was to invoke the privilege, and whether there is an exception to the marital privilege under Minnesota law relating to spouses who engage in joint criminal conduct. The availability of a privilege established under statutory or common law is an evidentiary ruling to be determined by the trial court and reviewed based on an abuse of discretion standard. *See* Minn. R. Evid. 104; *State v. Hooper,* 620 N.W.2d 31, 38 (Minn. 2000). The determination whether a particular testimonial privilege or exception exists, however, is a question of law which this court reviews de novo. *See Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 890 (Minn.1986); *Star Trib. v. Bd. of Educ.,* 507 N.W.2d 869, 870 (Minn. App.), *rev. denied* (Minn. Dec. 22, 1993).

■■ As a preliminary matter, we note that despite the statutory nature of Minnesota's marital privilege,[8] its roots are in the common law,[9] and this court retains inherent power to adopt standards by judicial opinion relating to the admissibility of evidence in the interest of justice. *See State*

8. The statutory nature of Minnesota's marital privilege distinguishes it from the federal marital privilege which is governed by the common law. *See* Fed.R.Evid. 501 (providing that federal testimonial privileges are to be "governed by the principles of the common law as they may be interpreted by the courts * * * in the light of reason and experience"). The federal cases endorsed by the dissent are of little persuasive value, as the federal privilege is subject to more flexible application and "is not as protective of the marital relationship" as Minnesota's approach. 11 Peter N. Thompson, *Minnesota Practice—Evidence,* § 501.03 (3d ed.2001). Moreover, the Supreme Court in *Trammel v. United States,* a decision cited extensively by the dissent, specifically recognizes that Minnesota is one of

the states that has retained the privilege against adverse spousal testimony, despite a general erosion of support for the privilege in other jurisdictions. 445 U.S. 40, 48 n. 9, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).

9. In *State v. Frey* we discussed the common law origins of Minnesota's prohibition on examining one spouse as a witness against the other without his or her consent and acknowledged that our statute "simply enact[ed] the common law." 76 Minn. 526, 528, 79 N.W. 518, 518–19 (1899); *see also State v. Feste,* 205 Minn. 73, 74, 285 N.W. 85, 86 (1939) (indicating that marital privilege statute codifies the common law).

*v. Erickson,* 589 N.W.2d 481, 485 (Minn. 1999) (recognizing this court's power not only to promulgate court rules, citing Minn.Stat. § 480.059, but also to "suspend the exercise of those rules where appropriate to ensure the proper administration of justice").[10] Thus, we agree with the dissent as to the nature of our authority, but the issue is whether it is appropriate, given our precedent, for this court to exercise that authority and declare the privilege against adverse spousal testimony unavailable. On this issue we disagree.

■ The social policy underlying the marital privilege was well set forth many years ago in *State v. Feste:*

> The family is the basic unit of society as the cell is of the body. To cause strife between the parties to a marriage contract is to undermine this institution and thus to weaken the entire social structure. Courts and legislatures have recognized the burden which antagonistic interests impose upon the intimate relations of husband and wife and the harm to the public which results from marital discord, and, have, as a general rule,

refused for this reason to permit one spouse to testify against the other without the latter's consent.

205 Minn. at 74–75, 285 N.W. at 86. The marital privilege in Minnesota is embodied in Minn.Stat. § 595.02, subd. 1(a). It provides that parties to a marriage cannot testify for or against each other without the other's consent, and further, that neither spouse can be examined as to any communication made by one to the other during the marriage, absent the other's consent. *Id.* In effect, the statute identifies two different types of marital privilege: 1) the privilege to prevent one spouse from testifying against the other during their marriage; and 2) the privilege to prevent one spouse from testifying at any time, during the marriage or after, concerning confidential interspousal communications during the marriage. *Leecy,* 294 N.W.2d at 283. The former, known as the privilege against adverse spousal testimony, is at issue here.[11]

### A. The Sham Marriage Exception

The trial court denied appellant's request to invoke the marital privilege in

---

10. While we acknowledge that the legislature has taken steps to limit the power of the court with respect to certain evidentiary issues, including privileges (*see, e.g.,* Minn.Stat. § 480.0591, subd. 6(a) (2000); Minn. R. Evid. 501), it is clear that the judicial branch has ultimate and final authority in such matters. *See, e.g., State v. Johnson,* 514 N.W.2d 551, 553–54 (Minn.1994) (stating that "[d]etermination of procedural matters is a judicial function."); *State v. Willis,* 332 N.W.2d 180, 184 (Minn.1983) (noting that the court has inherent authority to establish the rules of evidence); *see also State v. Larson,* 453 N.W.2d 42, 46 n. 3 (Minn.1990) (opposing the lower courts' characterization of the legislature as the "primary regulator of evidentiary matters"), *vacated on other grounds,* 498 U.S. 801, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990); *State v. Leecy,* 294 N.W.2d 280, 283 (Minn.1980) (observing that the marital privilege statute had not been superseded by court rule).

11. The statute goes on to carve out certain exceptions to this rule based primarily on the nature of the action involved, for instance, cases where one spouse is accused of committing a wrong against the other spouse. Specifically, the statute provides that the marital privilege will not apply in the following types of cases:

> [A] civil action or proceeding by one [spouse] against the other, * * * a criminal action or proceeding for a crime committed by one [spouse] against the other or against a child of either [spouse] * * * a criminal action or proceeding in which one [spouse] is charged with homicide or an attempt to commit homicide and the date of the marriage of the defendant is subsequent to the date of the offense, * * * an action or proceeding for nonsupport, neglect, dependency, or termination of parental rights.
> Minn.Stat. § 595.02, subd. 1(a).

part because both Jamie and appellant had indicated their marriage was motivated by a desire to be shielded from adverse testimony. The court therefore concluded that the interest protected by the privilege— that of preserving the integrity of the marriage—was outweighed by the competing interest in ascertaining the truth and presenting all relevant facts to the jury.[12] The trial court relied heavily on federal case law recognizing a "sham marriage" exception to the privilege against adverse spousal testimony. *See, e.g., United States v. Saniti,* 604 F.2d 603, 604 (9th Cir.1979). While acknowledging the differences between the federal common law marital privilege and our corresponding statutory privilege, the trial court concluded that Minnesota had followed a similar progression of narrowing the privilege such that the recognition of similar exceptions was appropriate.

Appellant argues that the trial court's reliance on federal jurisprudence is misplaced and that the trial court erred by recognizing exceptions to the marital privilege beyond those enacted by the legislature. Appellant further asserts that even if Minnesota's statute did contain a "sham marriage" exception, it would not apply here because appellant's marriage to Jamie was motivated by reasons other than merely the desire to invoke the privilege.

The state, on the other hand, claims that based on the evidence, the trial court reasonably concluded that the marriage of appellant and Jamie was disingenuous and entered into only to insulate the couple from having to testify against each other, initially in relation to the robbery charges and later with respect to Camp's murder. The state asserts that upholding the marital privilege in this case would be absurd and contrary to this court's previous rulings narrowly construing the statute to avoid creating "artificial barriers" to the truth. *See Hannuksela,* 452 N.W.2d at 676; *see also Larson v. Montpetit,* 275 Minn. 394, 402, 147 N.W.2d 580, 586 (1966) ("[E]videntiary privileges constitute barriers to the ascertainment of the truth and are therefore to be disfavored and narrowly limited to their purposes * * *.").

■ While this court has at least implicitly recognized the legitimacy of the marriage as a factor in determining whether to apply the marital privilege,[13] we decline to conclude that the marriage at issue here was so clearly a sham that the privilege should be denied on that basis. We recog-

---

12. This balancing approach was articulated by the U.S. Supreme Court in *Trammel,* where it considered "whether the privilege against adverse spousal testimony promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice." 445 U.S. at 51, 100 S.Ct. 906. Recognizing the value of the sole remaining justification for this privilege, that of "fostering the harmony and sanctity of the marriage relationship," the Supreme Court chose to narrow rather than abolish it. *Id.* at 44, 53, 100 S.Ct. 906. This court followed a similar analysis in the context of the interspousal communication privilege in *State v. Hannuksela* where we concluded that adopting a narrow definition of "communication" best served the competing interests in protecting the marital relationship and assur-

ing that the jury has access to all relevant facts. 452 N.W.2d 668, 676 (Minn.1990).

13. *See, e.g., Hannuksela,* 452 N.W.2d at 676 (comparing the marital interest being protected by the privilege with the burden imposed on the administration of justice by precluding potentially important testimony, and ultimately deciding to narrow the definition of "communication" with respect to the interspousal communication privilege); *Leecy,* 294 N.W.2d at 283 (holding that the trial court erred in sustaining a claim of marital privilege exercised by defendant's estranged wife and citing federal case law for the proposition that "a marriage well on its way to final dissolution will not support a claim of the [adverse spousal testimony] privilege").

nize that the record reveals that one of the primary reasons, perhaps the only reason, that Jamie entered into marriage was to take advantage of the statute prohibiting adverse spousal testimony. But the privilege rests with appellant, and appellant appears to have been motivated by several factors, among them perhaps the most conventional—his affection for Jamie. He argues that his actions as well as his words prove his motive for marriage—he began living with Jamie shortly after they met, he attended premarital classes with her at church long before the robbery, he adopted one of her children, he fathered his own child with Jamie, and he vainly shouldered full blame for the robbery to prevent her incarceration.

A review of our case law suggests that a strong showing is required to conclude that the marriage protected by the privilege is indeed so empty as to render the purpose of the privilege valueless. In *State v. Frey*, we concluded that the marital privilege statute protected a defendant husband from adverse spousal testimony even where a husband was being prosecuted for a premarital crime against his wife,[14] 76 Minn. at 530, 79 N.W. at 519, and in *State v. Feste* we held that a man contesting charges brought by his wife prior to their marriage that he was the father of her illegitimate child could preclude his wife from testifying against him at trial based on the marital privilege.[15] 205 Minn. at 76, 285 N.W. at 87. In no case have we ruled that a marriage is not worthy of the protection of the marital privilege, a statutory rule engrained in our

state's jurisprudence well over a century ago. *See* Pub. Stat. c. 84, § 53 (1859); *Huot v. Wise*, 27 Minn. at 69–70, 6 N.W. at 426. We conclude that on this record, the trial court abused its discretion in ruling that appellant's marriage was a sham.

B. The Joint Participant Exception

■ We next turn to the determination of the trial court that the couple's joint criminal activity constituted an additional basis to preclude application of the marital privilege. The "joint participant" exception, also borrowed from federal jurisprudence, bars the application of the marital privilege to a defendant who engaged in joint criminal activity with his or her spouse. *See United States v. Van Drunen*, 501 F.2d 1393, 1396 (7th Cir.1974). This exception is based on reasoning that the policy of preserving family harmony is not sufficiently important to justify assuring a criminal that he can enlist his or her spouse as an accomplice without fear of creating an adverse witness. *Id.*

Appellant again argues that it was improper for the trial court to recognize an exception to the testimonial privilege that was not identified in the statute, and that the legislature is in a better position to address public policy issues than the court.

■ We have not directly ruled on denial of the spousal privilege based on the joint participation of the spouses in criminal activity, although we have indirectly supported its rationale, *see, e.g., Hannuksela*, 452 N.W.2d at 676 ("'A loyal spouse should not, in our view, become a

---

**14.** The possibility of a sham marriage was also raised but the court declined to consider it on appeal because it had not been raised at the trial court level. *Frey*, 76 Minn. at 530, 79 N.W. at 519.

**15.** See also *Huot v. Wise*, 27 Minn. 68, 69–70, 6 N.W. 425, 426 (1880) (upholding the marital privilege even in an action by husband

against defendant for enticing wife away where defense was based on alleged mistreatment of wife by her husband and wife was willing to testify). However, the outcomes of *Feste* and *Huot* may be different under the current marital privilege statute. *See supra* note 11.

partner in crime with the blessing of the law bestowed through a strained construction of the statute which is said to be supported by a policy of promoting marital bliss' " quoting *People v. Simpson*, 39 Ill. App.3d 661, 350 N.E.2d 517, 524 (1976), *rev'd on other grounds*, 68 Ill.2d 276, 12 Ill.Dec. 234, 369 N.E.2d 1248 (1977)), and we have expressly recognized the strict application of a privilege where it stands "as a barrier to testimonial disclosure," *Minneapolis Star & Trib. Co. v. Hous. & Redev. Auth. of Minneapolis*, 310 Minn. 313, 320, 251 N.W.2d 620, 624 (1976) (citation and quotation omitted). Nonetheless, as noted above, our appellate courts have a history of recognizing the important social policy objective of preserving the marital relationship and deferring to the legislature to determine public policy with regard to family and marital issues.[16] For example, we refer again to *Hannuksela* where we addressed as a first impression what acts or gestures are included in the term "communication" in Minn.Stat. § 595.02, subd. 1(a): the spouse cannot "be examined as to any communication made by one to the other during the marriage." 452 N.W.2d at 675. Even though the defendant and his spouse were divorced at the time of trial, we stated: "[W]e feel free to adopt a construction which seems to best reflect the law's social policy of protecting the marital relationship without erecting artificial 'barriers to the ascertainment of truth.' " *Id.* at 676 (quoting *Larson*, 275 Minn. at 402, 147 N.W.2d at 586) (citation omitted). Later we again emphasized the importance of protecting marital confidences as the public policy served by section 595.02, subd. 1(a) and cited *Wigmore on Evidence:* " 'The privilege has for its object the security from apprehension of disclosure—a security of consequence of which confidences will be freely given and not withheld.' " 452 N.W.2d at 676 (quoting VIII J. Wigmore, *Wigmore on Evidence* § 2337 at 657 (McNaughton rev. 1961)). Thus, while we recognize the concern for establishing "artificial barriers to the truth," our jurisprudence clearly weighs the balance in favor of the social policy of protecting the sanctity of the marriage. It is simply too great a departure from over 100 years of this court's jurisprudence[17] to adopt an exception to the marital privilege of this nature.

---

16. A sample of our opinions demonstrates the depth and breadth of this tradition: *State v. Mayhood*, 308 Minn. 259, 263, 241 N.W.2d 803, 805 (1976) (deferring to the legislature the policy decision whether to extend the rule of legal unity of spouses); *Beaudette v. Frana*, 285 Minn. 366, 368–69, 373, 173 N.W.2d 416, 417–18, 420 (1969) (abrogating the absolute defense of interspousal immunity in actions for tort only after legislature declined to do so upon invitation by the court in deference to traditional legislative determination of significant considerations of public policy); *Estate of Jeruzal v. Jeruzal*, 269 Minn. 183, 195, 130 N.W.2d 473, 481 (1964) (providing the legislature with the first opportunity to take action to protect the rights of a surviving spouse even in the area of judicially-created Totten trusts); *State v. Arnold*, 182 Minn. 313, 321, 235 N.W. 373, 376 (1931) (declaring it a matter of policy whether theft between a husband and wife constitutes larceny and noting that "policy is for the legislature"); *Drake v. Drake*, 145 Minn. 388, 391, 177 N.W. 624, 625 (1920) (rejecting an action in equity brought by one spouse against the other and observing that "the welfare of the home * * * so essential to society, demands and requires that no new grounds for its disturbance or disruption by judicial proceedings be ingrafted on the law by rule of court not sanctioned or made necessary by express legislation"), *overruled by Beaudette*, 285 Minn. at 373 n. 10, 173 N.W.2d at 420 n. 10.

17. *See, e.g., Hannuksela*, 452 N.W.2d at 676 (acknowledging Minnesota's important public policy of protecting the marital relationship); *Warner v. Warner*, 219 Minn. 59, 67, 17 N.W.2d 58, 62 (1944) (noting that preservation of the sanctity of marriage is essential to the public welfare (citing *Brockman v. Brockman*, 133 Minn. 148, 151, 157 N.W. 1086,

The dissent argues that in this 100 years of case law nothing has been said about a joint participant exception to the privilege against adverse spousal testimony. This is precisely the point. We have not adopted such an exception and we decline to do so, preferring instead to defer a policy determination of this nature to the legislature, the branch of government historically responsible for addressing issues of public policy relating to the sanctity of the family. While we do not condone the ringing silence of the prime witness to the crime, given the strong policy supporting the privilege embodied in the common law and statute, we choose not to graft such an exception on to the privilege at this time. Accordingly, we hold that the trial court erred as a matter of law in its ruling that the alleged joint criminal activity of appellant and Jamie justified an exception to the marital privilege.

## II.

■ In light of our ruling that the trial court erred in failing to preclude Jamie's testimony over appellant's objection, we consider whether that error was prejudicial. In making such a determination we apply a harmless error analysis. *See State v. Juarez,* 572 N.W.2d 286, 291 (Minn. 1997). If the verdict rendered was "surely unattributable" to the error, it is harmless beyond a reasonable doubt and the conviction may stand. *State v. Keeton,* 589 N.W.2d 85, 91 (Minn.1998); *Juarez,* 572 N.W.2d at 292. We conclude that admission of Jamie's testimony was not harmless beyond a reasonable doubt.

■ A review of the record reveals that the majority of the testimony regarding the events of May 1, 1997, came from

1087 (1916)); *Feste,* 205 Minn. at 74–75, 285 N.W. at 86 (stressing the importance of the marital institution as a building block of society); *Frey,* 76 Minn. at 528, 79 N.W. at 518–

Jamie. Directly through her own testimony and indirectly through the testimony of her fellow inmate and confidant, Jamie provided virtually all the details of the murder, including the purchase of the wine coolers and how appellant added the potentially lethal sleeping pills, the manner in which they lured Camp to the murder site, the well thought-out events of the car ride, the shots fired by appellant, the dragging of Camp's body to the back of the farmhouse, and the dumping of Camp's purse along the road later that evening. Furthermore, Jamie provided information regarding appellant's shotgun purchase, verified by authorities through store records. In short, it was Jamie's statements that tied together many of the facts provided by the experts and investigators and linked them to appellant. We therefore cannot conclude that the wrongful admission of Jamie's testimony was harmless beyond a reasonable doubt and that the verdict rendered was surely unattributable to that error. Accordingly, we reverse the conviction and remand for a new trial.

We remand for a new trial consistent with our ruling, and because we do so, we do not address appellant's final argument that the evidence presented at trial was insufficient to corroborate the testimony of Jamie, his alleged accomplice, and that the trial court erred in failing to instruct the jury *sua sponte* that a conviction cannot rest on the uncorroborated testimony of an accomplice.

Reversed and remanded.

LANCASTER, Justice (dissenting).

When a married person commits a crime with his or her spouse and is willing to testify about committing the crime, may

19 (noting the sound public policy on which the marital privilege is based, namely that of protecting marriage and the confidences of the spouses).

the defendant on trial silence that testimony by invoking the privilege against adverse spousal testimony? That important question is rightfully this court's to answer. In my view the court has shirked its responsibility in the name of a comity that is, in this instance, misplaced. For that reason I respectfully dissent.

The Minnesota Constitution separates the government into three distinct branches:

The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

Minn. Const. art III, § 1. The legislative power includes "the power to declare what acts are criminal and to establish the punishment for those acts as part of the substantive law." *State v. Lindsey*, 632 N.W.2d 652, 658 (Minn.2001). The judicial branch "regulates the method by which the guilt or innocence of one who is accused of violating a criminal statute is determined." *Id.*

As part of the judicial power, this court has the primary responsibility for the regulation of evidentiary matters. *Id.; State v. Olson*, 482 N.W.2d 212, 215 (Minn.1992). As a matter of comity, though, the court may enforce statutory rules of evidence. *State v. Lanam*, 459 N.W.2d 656, 658 (Minn.1990); *State v. Willis*, 332 N.W.2d 180, 184 (Minn.1983). That the court enforces a statute that governs a matter within its authority does not, however, constitute the surrender of its authority to the legislature:

It is true that this court has acquiesced in legislative acts prescribing administrative procedures for admission and

discipline of attorneys *as long as such acts did not usurp the right of the court to make the final decision. * * *.*

* * * [T]he court may wish to adopt some of the provisions by rule of the court. However, in so doing, *we do not concede that their enactment was a permissible legislative prerogative.*

*Sharood v. Hatfield*, 296 Minn. 416, 424–25, 210 N.W.2d 275, 279–80 (1973) (emphasis added) (holding statute unconstitutional as legislative assumption of judiciary's power to regulate the practice of law). Notwithstanding legislative attempts to limit the court's power to regulate evidentiary issues, the court's inherent authority includes the power to establish rules of evidence. *Willis*, 332 N.W.2d at 184. I agree, therefore, with the majority that "this court retains inherent power to adopt standards by judicial opinion relating to the admissibility of evidence in the interest of justice."

The majority correctly notes that two marital privileges exist in Minnesota: (1) the privilege against adverse spousal testimony; and (2) the marital communications privilege. Minn.Stat. § 595.02, subd. 1(a) (2000); *see State v. Leecy*, 294 N.W.2d 280, 283 (Minn.1980) (stating that section 595.02 has not been superseded by court rule). Marital confidences are protected by the communications privilege. Notwithstanding the majority's discussion of the communications privilege, that privilege is not at issue in this appeal. The issue before the court, and therefore the issue addressed by this dissent, involves the privilege against adverse spousal testimony when spouses jointly commit a crime.

The majority's exaltation of the statutory nature of Minnesota's marital privileges is peculiar in light of its recognition that the statute codifies the common law. The codification of the privilege against ad-

verse spousal testimony does not proscribe the court from interpreting it:

> Enactment of the rules governing human affairs into positive legislation reduces the statement of the law to more concise form than common or unwritten law. The advantages of brevity and conciseness are achieved, however, by sacrificing the ability to make specific provision for the multitudinous situations which may arise. In common-law jurisdictions this shortcoming has been overcome by judicial construction which modifies and synchronizes statute law with common-law rules and maxims.

2B Norman J. Singer, *Statutes and Statutory Construction* § 50:02 (6th ed.2000) (footnote omitted).

Minnesota Statutes § 595.02, subd. 1(a), is silent as to whether the privilege against adverse spousal testimony extends to spouses who commit crimes together. The majority's response, to wait for the legislature to resolve an issue that lies within the court's inherent authority to decide, ignores that we have not blindly followed the statutory language and that we have narrowed the privilege without legislative direction. *See Leecy*, 294 N.W.2d at 283 (relying on modern authority that "a marriage well on its way to final dissolution will not support a claim of the privilege" to hold that trial court erred in sustaining an exercise of the privilege against adverse spousal testimony). The majority's decision portends the abdication of the court's authority to regulate evidentiary matters.

Despite its acknowledgment of the court's inherent authority to establish rules of evidence, the majority provides no justification for its refusal to exercise the court's power to recognize a joint participant exception to the privilege against adverse spousal testimony. Instead, the majority states "[i]t is simply too great a departure from over 100 years of this

court's jurisprudence to adopt" the exception. Neither this court nor the legislature has ever adopted or rejected a joint participant exception to the privilege against adverse spousal testimony—100 years of jurisprudence say nothing at all on the subject. Because the legislature has not addressed the issue, the doctrine of comity does not arise. This case presents the first opportunity to rule on an issue that is within the court's inherent authority to decide. The court, therefore, should exercise its authority to determine whether the exception exists.

The policy underlying the privilege against adverse spousal testimony is to preserve marital harmony. *Trammel v. United States*, 445 U.S. 40, 44, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *State v. Feste*, 205 Minn. 73, 74–75, 285 N.W. 85, 86 (1939); 1 *McCormick on Evidence* § 66, at 280 (John W. Strong ed., 5th ed.1999). The preservation of marital harmony is not, however, an absolute goal to be pursued blindly. *See State v. Hannuksela*, 452 N.W.2d 668, 676 (Minn.1990) (refusing to consider the policy of protecting "the serenity of the marital relationship" in isolation); *Leecy*, 294 N.W.2d at 283 (noting that a marriage nearing dissolution will not support assertion of the privilege against adverse spousal testimony); *see also* Minn.Stat. § 595.02, subd. 1(a) (listing exceptions).

"[E]videntiary privileges constitute barriers to the ascertainment of truth and are therefore to be disfavored and narrowly limited to their purposes * * *." *Larson v. Montpetit*, 275 Minn. 394, 402, 147 N.W.2d 580, 586 (1966). We have narrowly construed the marital communications privilege to assure a jury's access to relevant facts:

> [I]f this policy of affording protection to the serenity of the marital relationship were to be considered in isolation, a

strong argument could be advanced justifying a broad construction [of the marital communications privilege]. However, to give such broad construction to the term "communication," would burden another important social policy—to-wit, one concerned with assuring that a jury in a criminal trial have access to all relevant facts. * * * "[A] loyal spouse should not, in our view, become a partner in crime with the blessing of the law bestowed through a strained construction of the statute which is said to be supported by a policy of promoting marital bliss."

*Hannuksela,* 452 N.W.2d at 676 (quoting *People v. Simpson,* 39 Ill.App.3d 661, 350 N.E.2d 517, 524 (1976), *rev'd on other grounds,* 68 Ill.2d 276, 12 Ill.Dec. 234, 369 N.E.2d 1248 (1977)).[1]

The majority ignores our refusal in *Hannuksela* to condone the transformation of a marriage into a criminal enterprise. In effect, the majority " 'secures, to every [spouse], one safe and unquestionable and ever ready accomplice for every imaginable crime.' " *Trammel,* 445 U.S. at 52, 100 S.Ct. 906 (quoting 5 Jeremy Bentham, *Rationale of Judicial Evidence* 340 (1827)). The goal of preserving marital

harmony, however, "does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or coconspirator he is creating another potential witness." *United States v. Van Drunen,* 501 F.2d 1393, 1396–97 (7th Cir.1974) (recognizing joint participant exception to the privilege against adverse spousal testimony); *see United States v. Clark,* 712 F.2d 299, 300–01 (7th Cir.1983) (citing *Van Drunen* ); *United States v. Trammel,* 583 F.2d 1166, 1169–70 (10th Cir.1978) (same), *aff'd on other grounds,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980).[2]

This court's precedent belies the majority's characterization of federal case law as being "of little persuasive value." This court has relied on federal case law to interpret the privilege against adverse spousal testimony. *See Leecy,* 294 N.W.2d at 283 (citing *United States v. Fisher,* 518 F.2d 836 (2d Cir.1975)); *cf. Hannuksela,* 452 N.W.2d at 676 & n. 11 (interpreting the marital communications privilege in accord with federal case law).

The majority imposes substantial costs on the criminal justice system. The majority's refusal to recognize a joint participant exception to the privilege against ad-

---

1. The majority misinterprets *Hannuksela* to support its conclusion that "our jurisprudence clearly weighs the balance in favor of the social policy of protecting the sanctity of the marriage." *Hannuksela* recognized the conflict between the policy of protecting the marital relationship and the policy of assuring that a jury in a criminal trial has access to all relevant facts, and adopted a *narrow* construction of the marital communications privilege so as to "best serve[ ] both policies." 452 N.W.2d at 676.

2. In *Trammel,* the United States Supreme Court vested in the witness-spouse alone the privilege to refuse to testify adversely to the defendant-spouse. *Trammel,* 445 U.S. at 53, 100 S.Ct. 906. Relying, at least in part, on the decision in *Trammel* to vest the privilege

in the witness-spouse alone, the Second, Third, and Ninth Circuits refused to adopt a joint participant exception to the privilege against adverse spousal testimony. *See United States v. Ramos–Oseguera,* 120 F.3d 1028, 1042 (9th Cir.1997), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053, 1059 (9th Cir.2000), *overruled by United States v. Buckland,* 277 F.3d 1173, 1182 (9th Cir.2002); *In re Grand Jury Subpoena United States,* 755 F.2d 1022, 1026–27 (2d Cir.1985), *vacated as moot sub nom. United States v. Koecher,* 475 U.S. 133, 106 S.Ct. 1253, 89 L.Ed.2d 103 (1986); *In re Grand Jury Empanelled October 18, 1979,* 633 F.2d 276, 278 (3d Cir.1980). That the nontestifying spouse controls the privilege in Minnesota undermines the persuasive value of these decisions.

verse spousal testimony prevents the jury from hearing the testimony of appellant's spouse because of appellant's—not the witness's—exercise of the privilege. Thus, the majority deprives the jury of access to highly relevant facts, to-wit, the testimony of a person who helped commit the crime.

Although the majority imposes substantial costs on the criminal justice system, it does not advance the interest underlying the privilege against adverse spousal testimony. Appellant admitted he married Jamie to take advantage of the privilege against adverse spousal testimony to prevent her from testifying about the robbery they committed before they murdered Camp. Jamie acknowledged the same, adding that her marriage to appellant was a "sham." Thus, rather than preserving marital harmony, the majority preserves a relationship in which each partner really has secured " 'one safe and unquestionable and ever ready accomplice for every imaginable crime.' " *Trammel*, 445 U.S. at 52, 100 S.Ct. 906 (quoting 5 Jeremy Bentham, *Rationale of Judicial Evidence* 340 (1827)). Appellant's clarification that he married Jamie to take advantage of the privilege and because he loved her does not alter the conclusion that the majority fails to advance the interest underlying the privilege. "When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve." *Id.* Here, Jamie agreed to testify against appellant. The barrier to the ascertainment of truth erected by the majority could not be more complete. The majority banishes from the witness stand a person who committed a crime *and is willing to testify about it.*

A spouse who is willing to testify against his or her spouse about crimes they committed together will suffer perverse consequences as a result of the majority's decision:

> [T]he [state] is unlikely to offer a [spouse] * * * lenient treatment if it knows that [the other spouse] can prevent [the spouse] from giving adverse testimony. If the [state] is dissuaded from making such an offer, the privilege can have the untoward effect of permitting one spouse to escape justice at the expense of the other. It hardly seems conducive to the preservation of the marital relation to place a [spouse] in jeopardy solely by virtue of [the other spouse's] control over [the spouse's] testimony.

*Id.* at 52–53, 100 S.Ct. 906.

The majority fails to explain its refusal to exercise the court's inherent authority to establish rules of evidence to recognize a joint participant exception to the privilege against adverse spousal testimony. In my view, the substantial burdens the majority imposes on the criminal justice system by permitting appellant to deprive the jury of the testimony of one of Camp's murderers are not justified by its thin reasoning and citation to family law cases. The legislature has not explicitly said that the testimonial privilege should extend to joint participants, and not even comity demands this perverse result. I would accept for the judiciary the responsibility of determining whether a joint participant exception to the privilege against adverse spousal testimony exists. Having accepted that responsibility, I would conclude that such an exception does exist, and affirm the conviction.